# LOUISVILLE BRIDGE COMPANY *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF KENTUCKY.

No. 540. Argued December 8, 11, 1916.—Decided January 8, 1917.

The Acts of July 14, 1862, c. 167, 12 Stat. 569, and February 17, 1865, c. 38, 13 Stat. 431, under which appellant's bridge was built across the Ohio River, were not intended and did not operate to confer an irrepealable franchise to maintain the bridge as authorized and originally constructed, nor did they create a vested right demanding compensation under the Fifth Amendment when changes were subsequently required by Congress in the interest of navigation. *United States* v. *Parkersburg Branch R. Co.*, 134 Fed. Rep. 969; 143 Fed. Rep. 224, overruled. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, and *United States* v. *Baltimore & Ohio R. R. Co.*, 229 U. S. 244, distinguished.

When indefeasible private rights are sought to be derived from regulatory provisions made in the exercise of the power to regulate commerce, the case is peculiarly one for the application of the universal rule that grants of special franchises and privileges are to be strictly construed in favor of the public right, and nothing is to be taken as granted concerning which any reasonable doubt may be raised.

In construing the acts above cited, the court judicially notices their coincidence in time with the Civil War, the lack of bridges over the Ohio at Cincinnati, Louisville, and points west, the natural difficulties of crossing the stream, the urgent need of a bridge to transfer troops and supplies south, and the fact that financial disturbances made it difficult to secure capital for large undertakings.

The absence of an express reservation of the right to alter or repeal has not the same significance in acts of Congress as in state legislation, and in the acts above cited is without conclusive effect.

Acts like those here in question, being passed in the regulation of commerce for the guidance of future conduct, carry the suggestion of future changes; and, in their construction, it should be presumed that Congress intended to preserve its power to make future adjustments, in pace with commercial developments—assuming, but not deciding, that such power could be shackled or surrendered.

The Act of March 3, 1899, c. 425, 30 Stat. 1121, 1153, so repealed or modified the Acts of 1862 and 1865 as to include appellant's bridge within its operation.

The authority of the Secretary of War under the Act of 1899, to require changes, involves no unlawful delegation of legislative or judicial power.

233 Fed. Rep. 270, affirmed.

THE case is stated in the opinion.

*Mr. William W. Crawford* and *Mr. Lawrence Maxwell*, with whom *Mr. Charles H. Gibson* was on the brief, for appellant:

The power of Congress to regulate bridges is derived solely from the commerce clause, *Bridge Company* v. *United States*, 105 U. S. 475, 489; it is subject to the limitation of the Fifth Amendment that private property shall not be taken without compensation. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 366.

The bridge in question was constructed under an irrevocable franchise. The Acts of 1862 and 1865 contain no reservation of the right to alter or amend, nor any suggestion that the property of the bridge builders is beyond the protection of the Fifth Amendment. They declare that the bridge shall be a lawful structure and a post route of the United States, and the 1862 Act provides that boats shall not "interfere with the elevation, construction or use of any of the bridges erected or legalized" thereunder. These facts clearly indicate that Congress

fully appreciated the permanency of the grant. In the absence of a reservation of the right to alter or amend, the grant of a corporate franchise is beyond' the power of the State to impair. *Dartmouth College* v. *Woodward,* 4 Wheat. 518; *Owensboro* v. *Cumberland Telephone Co.,* 230 U. S. 65. The construction of the Ohio Falls Bridge in accordance with the terms of the Acts of 1862 and 1865 constituted, therefore, an irrevocable contract between appellant and the United States,. and vested in the former a property right of which it could not be deprived without payment of just compensation.

The claim made in the opinion of the court below that one Congress must transmit unfettered all constitutional powers to a succeeding Congress is without foundation. Congress may, if it sees fit, wholly destroy appellant's bridge under the power of eminent domain if the interests of navigation so require, but compensation must be paid.

Compliance with the order of the Secretary of War involves the destruction of appellant's bridge and its replacement with other property at an increased cost of over $400,000, and constitutes a "taking" within the purview of the Fifth Amendment. *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, 177; *United States* v. *Lynah,* 188 U. S. 445, 468, 470; *Missouri Pacific R. R. Co.* v. *Nebraska,* 217 U. S. 205; *United States* v. *Welsh,* 217 U. S. 333; *Peabody* v. *United States,* 231 U. S. 531. See also *Monongahela Navigation Co.* v. *United States,* 148 U. S. 377.

The basis of the decision in *Bridge Company* v. *United States, supra,* was that if the exercise of the reserved power incidentally destroys property, it is a risk which the grantees assume in accepting the grant. Both that case and *Hannibal Bridge Co.* v. *United States,* 221 U. S. 194, involved structures built under acts of Congress which expressly reserved the power to alter or amend, and are not in point. Nor are *Union Bridge Co.* v. *United States,* 204 U. S. 364, and *Monongahela Bridge Co.* v. *United*

*States*, 216 U. S. 177, controlling here. Those cases concerned bridges built under state authority and without congressional sanction, and if, as stated in *Bridge Company* v. *United States*, the builders of a bridge "who act on state authority alone necessarily assume all the risk of legitimate congressional interference," it is obvious that when Congress has granted a right to construct bridges that are "lawful structures," without reserving the right to withdraw its assent thereafter, it is estopped to do so.

The Act of 1899, being a general act, is not to be construed as affecting appellant's special rights acquired under the Acts of 1862 and 1865. See *Washington* v. *Miller*, 235 U. S. 422, 428; *McChord* v. *Louisville & Nashville R. R. Co.*, 183 U. S. 483; *Southwestern Coal Co.* v. *McBride*, 185 U. S. 499. It does not, in terms, repeal the earlier acts.

Congress, by the Acts of 1862 and 1865, made a legislative finding that the bridge, as built, was not an "unreasonable" or "unlawful," but a "lawful" obstruction, if an obstruction at all. *Wheeling Bridge Case*, 18 How. 421, 432. The record shows that the bridge is really less of an obstruction to navigation at the falls than when it was built. The physical situation in 1914, then, not being materially different from what it was at the time of the passage of the Acts of 1862 and 1865, there is no justification for a reversal of the legislative decree. To apply § 18 of the 1899 Act to the Ohio Falls Bridge is to effect a reversal by the Secretary of the judgment of Congress on the fact, found by it in 1862 and 1865 on exactly the same evidence. If the Secretary's finding is sufficient to destroy the bridge, it is not the ascertainment of a fact which can be legally delegated to him, but the reversal of the legislative discretion vested in Congress alone.

The act applies to "any railroad or other bridge now constructed, or which may hereafter be constructed." In 1899 there were two classes of bridges to which the word

"now." could properly apply without affecting vested rights: (1) bridges theretofore built under state authority only, and (2) bridges theretofore built under congressional authority with a power of amendment or repeal reserved.

The power of the Secretary to order alterations in bridges constructed under the Act of 1862, without compensation, was denied in 22 Ops. A. G. 343, in which § 4 of the Act of 1890, similar to § 18 of the Act of 1899, was held to apply only to bridges built under acts of Congress in which the right to require changes was expressly reserved. With knowledge of this opinion, Congress did not see fit to change the wording of the authority given to the Secretary in § 18 of the Act of 1899, and presumably did not intend that the section should apply to bridges built under the Act of 1862. Not content with the opinion of the Attorney General, the government sought to enjoin the reconstruction of the bridge involved, but the bill was dismissed. *United States* v. *Baltimore & Ohio R. R. Co.*, unreported decision, referred to in 134 Fed. Rep. at p. 973. In 25 Ops. A. G. 194, § 18 of the 1899 Act was considered in connection with the Ohio Falls Bridge, and the section held inapplicable. It was also held inapplicable to bridges constructed under the 1862 Act in *United States* v. *Parkersburg Branch R. Co.*, 134 Fed. Rep. 969; affirmed in 143 Fed. Rep. 224, and other unreported cases referred to in 134 Fed. Rep. at p. 973, and *United States* v. *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.*, (Southern District of Ohio), decided February 18, 1911, and the right to direct changes without compensation denied and the franchise rights of the company sustained.

*United States* v. *Baltimore & Ohio R. R. Co.*, 229 U. S. 244, in essence, supports the proposition that the Act of 1899 through the power of the Secretary under § 18 was not intended to apply to the "lawful structure" created under the Act of 1862. For though rested on the doctrine

of *res judicata*, the decision necessarily implied that the action of the Secretary taken under the 1899 Act after the former judgment was not tantamount to exercise of the discretion of Congress to make the lawful structure unlawful.

*Mr. Assistant Attorney General Wallace* for the United States.

MR. JUSTICE PITNEY delivered the opinion of the court.

Appellant is the owner of a bridge across the Ohio River at Louisville, Kentucky, known as the "Ohio Falls Bridge," which was built under an act of Congress approved February 17, 1865, c. 38, 13 Stat. 431, supplementary to an act approved July 14, 1862, c. 167, 12 Stat. 569. The 1862 Act as amended allowed the bridge to be built under one of several plans detailed, and with a prescribed minimum width for spans and a minimum clearance height above the water. This act, in its fifth section, declared "That any bridge or bridges erected under the provisions of this act shall be lawful structures, and shall be recognized and known as post-routes, . . . and the officers and crews of all vessels, boats, or rafts navigating the said Ohio River are required to regulate the use of the said vessels and of any pipes or chimneys belonging thereto, so as not to interfere with the elevation, construction, or use of any of the bridges erected or legalized under the provisions of this act." The first section of the 1865 Act contained a proviso "that said bridge and draws shall be so constructed as not to interrupt the navigation of the Ohio River;" the second section declared "that the bridge erected under the provisions of this act shall be a lawful structure, and shall be recognized and known as a post-route."

The Ohio Falls Bridge was built in all respects in ac-

cordance with the requirements of these acts, except that, instead of the minimum channel span of 300 feet prescribed, the builders made spans of 380 feet and 352¼ feet, respectively, and exceeded the clearance height of the highest of the authorized plans, thus expending $150,000 more than was necessary to comply with the letter of the law. The bridge was completed in the year 1870, and since then has been continuously in use as a railroad bridge, furnishing one of the principal thoroughfares across the Ohio River from north to south. Its superstructure now requires renewal, but this can be done without obstructing navigation any further than the bridge does at present and has done ever since its construction.

In the year 1914 the Secretary of War, proceeding under § 18 of an act of Congress approved March 3, 1899, c. 425, 30 Stat. 1121, 1153, gave notice to appellant that he had good reason to believe the bridge was an obstruction to navigation because of insufficient horizontal clearance of the channel span crossing the main navigable channel of the river and insufficient width of opening in the existing swing-span crossing the Louisville and Portland Canal, and appointed a time and place for a hearing upon this question. Appellant introduced no evidence at the hearing, but filed a protest against any action by the Secretary under the Act of 1899, on the ground that this act did not affect bridges constructed under the Acts of 1862 and 1865, or that, if it attempted to do so, it was unconstitutional. After the hearing the Secretary made an order notifying appellant to alter the bridge within three years, so as to provide an enlarged horizontal opening for the main navigable channel, and to change the swing-span across the canal to a lift-span having a prescribed horizontal clearance, and a prescribed vertical clearance when open. A further hearing and some correspondence having led to no result, appellant notified the Secretary of War in writing that it insisted on the right

to renew its superstructure on the existing masonry without changing the length of any of the existing spans, "so that when completed, it will not interfere with navigation any more than it does now," and that it intended to commence the work of renewal at once.  Shortly thereafter the Attorney General filed a bill for an injunction in the District Court; appellant answered setting up its claims as above indicated; and the case was brought to a hearing upon stipulated facts presenting, as the sole question to be determined, the legality of the order of the Secretary of War as applied to the bridge in question.  A final decree was made restraining appellant from reconstructing the superstructure of the bridge in a manner inconsistent with the provisions of the Secretary's order (233 Fed. Rep. 270), and the case comes here by direct appeal as permitted by § 18 of the 1899 Act.

Concisely stated, the position of appellant is that the Ohio Falls Bridge was constructed under an irrevocable franchise, and became upon its completion a lawful structure and the private property of appellant; that Congress had no power to require its removal except in the exercise of the federal authority to regulate commerce, and subject to the provision of the Fifth Amendment that private property shall not be taken for public use without just compensation; and that the Act of 1899, being a general act, does not by fair construction operate to repeal the special franchise conferred by the Acts of 1862 and 1865, and if it does it is unconstitutional because it fails to make provision for compensation.

The first and fundamental contention is rested in part upon facts of which we may take judicial notice, that when the Acts of 1862 and 1865 were passed the Civil War was in progress, and there was urgent need of a bridge over the Ohio River west of the Big Sandy (the eastern boundary of Kentucky) to provide for the transfer of troops and supplies from the north to the south; that there

were no bridges crossing the Ohio at either of the cities of Cincinnati or Louisville, or at any point west of them, and that the movement of troops and supplies was thereby greatly hampered; that the river at Louisville is approximately a mile wide, the current quite rapid on account of the Falls, and in winter frequently filled with ice, so as to render a bridge a pressing necessity; and that the war had disturbed somewhat the finances of the country, and capital for large undertakings was difficult to secure. But the argument lays especial stress upon the declaration that the bridge in question should be a lawful structure and recognized and known as a post route, and the fact that neither the original nor the supplemental acts contained any reservation of the right to alter, or amend, or revoke the franchise.

These are no doubt weighty considerations, and raise a grave question, but they do not necessarily dispose of it. Clearly, the acts were passed under the power of Congress to regulate commerce. That power is a very great power, and in its nature continuing, not being exhausted by any particular exercise. We need not go so far as to say that Congress could not in any case by contract or estoppel prevent itself from modifying or revoking a regulation once made and substituting another in its place without compensation. But when private rights of an indefeasible nature are sought to be derived from regulatory provisions established in the exercise of this power, the case is peculiarly one for the application of the universal rule that grants of special franchises and privileges are to be strictly construed in favor of the public right, and nothing is to be taken as granted concerning which any reasonable doubt may be raised. As this court, speaking through Mr. Chief Justice Waite, declared in *Bridge Company v. United States,* 105 U. S. 470, 480: "Congress, which alone exercises the legislative power of the government, is the constitutional protector of foreign and inter-state com-

merce. Its supervision of this subject is continuing in its nature, and all grants of special privileges, affecting so important a branch of governmental power, ought certainly to be strictly construed. Nothing will be presumed to have been surrendered unless it was manifestly so intended. Every doubt should be resolved in favor of the government."

The absence of an express reservation of the right to alter or amend is not conclusive. As is well understood, reservations of this kind have a peculiar fitness in state legislation, being traceable historically to the decision of this court in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, that a corporate charter is a contract within the meaning of that clause of Article I, § 10, of the Constitution, which declares that no State shall pass any law impairing the obligation of contracts, so that a state law altering such a charter in a material respect without the consent of the corporation is unconstitutional and void; and the suggestion in the concurring opinion of Mr. Justice Story (p. 675) that the reservation of a power to alter or amend the charter would leave the State free to enact subsequent amendatory legislation. *Miller* v. *State*, 15 Wall. 478, 494; *Greenwood* v. *Freight Company*, 105 U. S. 13, 20; *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 352. Congress is not prevented by the Constitution from passing laws that impair the obligation of contracts, and in its enactments the presence or absence of such a reservation has not the same peculiar significance that it has in state legislation. It is no doubt a circumstance, but not by any means conclusive.

At the time the Acts of 1862 and 1865 were passed it was not customary for Congress to include in legislation of this character an express reservation of a power of future control or repeal. In an act of August 31, 1852, §§ 6 and 7, c. 111, 10 Stat. 110, 112, certain bridges already in existence across the Ohio River were declared to be lawful

structures. The next acts of a similar character appear to have been those now under consideration. Contemporaneously with the second of these, an act was passed (c. 39, 13 Stat. 431) declaring a bridge then under construction across the Ohio between Cincinnati and Covington to be a lawful structure. In neither of these was there any express reservation of future control. In succeeding years [1] numerous bridge acts were passed containing in one form or another a reservation of the power to alter or amend the act or to withdraw the assent given. These provisions may well have been inserted from abundant caution, and because provisions of like character had become familiar in state legislation. But obviously they throw no direct light upon the intent of Congress in preceding legislation.

While scrutinizing the Acts of 1862 and 1865 in the effort to determine the legislative intent as therein expressed, we should primarily consider the fact that they were exertions of a power to regulate commerce. Such a regulation, designed as it is to furnish a guiding rule for future conduct, carries with it the suggestion that it may not always remain unchanged. And since our interstate and foreign commerce is a thing that grows with the growth of the people, and its instrumentalities change with the development and progress of the country, it was not natural that Congress, in enacting a regulation of such commerce, should intend to put shackles upon its own power in respect of future regulation. The act declared that the bridge when erected should be "a lawful structure"; but there are no words of perpetuity, nor any express covenant against a change in the law. There is a

---

[1] Acts of July 25, 1866, § 13, c. 246, 14 Stat. 244; February 27, 1867, c. 98, 14 Stat. 412; February 21, 1868, c. 10, 15 Stat. 37; July 6, 1868, c. 134, 15 Stat. 82; July 20, 1868, c. 179, 15 Stat. 121; February 19, 1869, c. 37, 15 Stat. 272; March 3, 1869, c. 139, 15 Stat. 336; Joint Resolution of March 3, 1869, 15 Stat. 347.

proviso in the 1865 Act that the bridge and draws shall be so constructed as not to interrupt the navigation of the river; an evident modification of that clause of the 1862 Act which required vessels to be so regulated as not to interfere with the bridge. It is possible to construe the proviso as referring solely to the time of original construction, and as satisfied if the bridge and draws did not then obstruct navigation; but this would disregard the fundamental rule that requires strict construction of such grants as against the private right. In the light of that rule, the true meaning rather is that the bridge and draws should be so constructed as not at any time to interrupt navigation. See *West Chicago Street R. R. Co.* v. *Chicago*, 201 U. S. 506, 515, 521. Indeed, the proviso seems to have been so interpreted by the recipients of the grant, for, as appears from the stipulation, the original builders of the bridge did not limit themselves to giving only what they were compelled by law to give, but at large expense to themselves exceeded the heights and widths that the act required.

It is true that Congress must have contemplated that a large investment of private capital would be necessary, and that the bridge when once constructed could not be abandoned or materially changed without a total or partial loss of value. This is a very grave consideration, and we have not at all overlooked it; but we cannot deem it controlling of the question presented. It may be assumed that the parties foresaw, what experience since has demonstrated, that it would be many years before changing conditions of navigation would render the bridge out of date, and that the investors were satisfied with the prospect of the profit to be gained from the use of the bridge in the meantime.

A circumstance perhaps bearing in the same direction is that appellant is a Kentucky corporation, chartered by an act of the legislature approved March 10, 1856 (Acts

1855-6, vol. 2, p. 426), which contains a proviso, "that said bridge shall be constructed so as not to obstruct navigation, further than the laws of the United States and the decisions of the Supreme Court of the United States shall hold to be legal."

Reviewing the entire question, bearing in mind the nature of the subject-matter, the circumstances of the period of the enactments, and the language employed by Congress, and construing this strictly against the grantee as the familiar rule requires, we are constrained to hold that the Acts of 1862 and 1865 conferred upon appellant no irrepealable franchise to maintain its bridge precisely as it was originally constructed, and created no vested right entitling appellant to compensation under the Fifth Amendment in case Congress should thereafter, in the exercise of its power to regulate commerce, require changes to be made in the interest of navigation.

This being so, the authority of Congress to compel changes was precisely the same as if the bridge had been constructed under state legislation without license from Congress, as in *Union Bridge Co.* v. *United States*, 204 U. S. 364, 388, 400; *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177, 193; or had been constructed under congressional consent or authorization coupled with an express reservation of the right of revocation or amendment, as in *Bridge Company* v. *United States*, 105 U. S. 470, 481; *Hannibal Bridge Co.* v. *United States*, 221 U. S. 194, 207. We are aware that a different result was reached by the Circuit Court and Circuit Court of Appeals in *United States* v. *Parkersburg Branch R. Co.*, 134 Fed. Rep. 969; 143 Fed. Rep. 224; and by the Circuit Court in some previous cases referred to in 134 Fed. Rep. 973. But, upon mature consideration, we have concluded that these decisions must be overruled.

Appellant cites *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, but it is plainly distinguishable.

There the Navigation Company under a state charter
had constructed locks and dams in the Monongahela
River, to the great improvement of its navigation, and by
a supplement to its charter had been required to commence
the construction of lock and dam No. 7 in such manner
and on such plan as would extend the navigation from its
then present terminus to the state line. This work was to
complete the company's improvements in the State of
Pennsylvania. Thereafter Congress, in 1881, appropri-
ated $25,000 for improving the Monongahela River in
West Virginia and Pennsylvania, with the proviso that
the money should not be expended until the Navigation
Company had undertaken in good faith the building of
lock and dam No. 7 and had given assurance to the Secre-
tary of War of its ability and purpose to complete the
same. The company gave satisfactory assurance to the
Secretary, commenced the work in 1882, and completed
it in 1884. By Act of August 11, 1888, c. 860, 25 Stat.
400, 411, Congress authorized the Secretary of War to
purchase this lock and dam from the company, and in
the event of his inability to make a voluntary purchase
within a specified limit of expense then to take proceedings
for their condemnation, with a proviso that in estimating
the sum to be paid by the United States the franchise of
the corporation to collect tolls should not be considered
or estimated. It appeared that the tolls received by the
company for the use of its works including lock and dam
No. 7 averaged $240,000 per annum, that the money
value of the entire works and franchise was not less than
$4,000,000, and that the actual toll receipts of lock and
dam No. 7 were in excess of $2,800 per annum, and would
probably increase in the near future. This court held the
proviso excluding the franchise to collect tolls from con-
sideration in the condemnation proceedings to be incon-
sistent with the Fifth Amendment (p. 336). But it will
be observed that this was not a case of removing a struc-

ture from the river on the ground that it interfered with navigation, but a taking over of a structure and employing it in the public use as an instrumentality of navigation. In short, there was a clear taking of the property of the company for public use as property, and an attempt at the same time to exclude from consideration an essential element of its value when ascertaining the compensation to be paid. The case has no bearing upon the one at bar.

Reference is made also to our recent decision in *United States* v. *Baltimore & Ohio R. R. Co.*, 229 U. S. 244; and although this court merely affirmed the Circuit Court on the ground that the matter was *res judicata*, it is argued that we necessarily decided the questions raised in the present case in order to come to the conclusion that the question was one of *res judicata*. In view of the very plain language employed in the opinion (pp. 251, 254), the argument is baseless.

There remains only the contention that the Act of 1899, being a general act, does not by fair construction operate to repeal or modify the special rights conferred upon appellant by the Acts of 1862 and 1865. We deem this point likewise untenable. In terms the act applies without qualification to "any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States." It is argued that at the time of its passage there were two classes of bridges to which the term "now constructed" would properly apply without affecting any vested right, namely (1) bridges theretofore built under state authority only, and (2) bridges theretofore built under congressional authority with a power of amendment or repeal expressly reserved; and that full effect can be given to the language of § 18 without holding that it is a repeal by implication of the declaration of Congress in the Act of 1865 that the Ohio Falls Bridge as constructed was a lawful structure and a post route of the United States. But the 1899 Act

is not only unqualified in its terms, but from the nature of the subject-matter there is every reason for giving it a universal application. As we have seen, appellant had no indefeasible right to maintain its bridge as originally constructed, and the absence of an express right of repeal from the Acts of 1862 and 1865 has as little bearing upon the question of the practical justice or injustice of requiring an alteration in the bridge as it has upon the question of constitutional right. And of course, from the point of view of the requirements of navigation, the particular phraseology of the acts by which the construction of the different bridges was authorized is altogether insignificant.

It may be conceded that the declaration of Congress in the Act of 1865 that the bridge was a lawful structure was conclusive upon the question until Congress passed some inconsistent enactment. As was said by Mr. Justice Nelson, speaking for the court in the *Wheeling Bridge Case,* 18 How. at p. 430, although it may have been an obstruction in fact, it was not such in the contemplation of the law. But § 18 of the 1899 Act wrought a change in the law. (There were similar provisions in an act of August 11, 1888, § 9, c. 860, 25 Stat. 400, 424; and in an act of September 19, 1890, § 4, c. 907, 26 Stat. 426, 453; but we pass them by.) Congress thereby declared that whenever the Secretary of War should find any bridge theretofore or thereafter constructed over any of the navigable waterways of the United States to be an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, it should be the duty of the Secretary, after hearing the parties concerned, to take action looking to the removal or alteration of the bridge, so as to render navigation through or under it reasonably free, easy, and unobstructed. As this court repeatedly has held, this is not an unconstitutional delegation of legislative or judicial power to the Secretary. *Union Bridge Co.* v. *United States,* 204 U. S. 364, 385;

*Monongahela Bridge Co.* v. *United States*, 216 U. S. 177, 192; *Hannibal Bridge Co.* .v. *United States*, 221 U. S. 194, 205. The statute itself prescribed the general rule applicable to all navigable waters, and merely charged the Secretary of War with the duty of ascertaining in each case, upon notice to the parties concerned, whether the particular bridge came within the general rule. Of course the Secretary's finding must be based upon the conditions as they exist at the time he acts. But the law imposing this duty upon him speaks from the time of its enactment. And there is no real inconsistency between a declaration by Congress in 1865 that a certain bridge was a lawful structure and not an improper impediment to navigation, and a contrary finding by the Secretary of War in the year 1914.

Since we are constrained to hold that none of appellant's contentions is well founded, it results that the decree under review must be

*Affirmed.*