UNITED STATES v. RIVER ROUGE IMPROVEMENT CO. et al. (two cases).

SAME v. DODGE BROS. et al.

(Circuit Court of Appeals, Sixth Circuit.  December 5, 1922.)

Nos. 3688, 3689, 3690.

1. Eminent domain ☞254—Plaintiff in error cannot rely on error for which new trial was offered and refused.

In proceedings for the condemnation of a large number of tracts for a river improvement, where counsel for two of the owners brought before the jury the fact that the awards were to be paid by private interests, and not by the government, and the trial judge granted the government's mo-

tion for an order declaring a mistrial, but announced that the matter could not be brought piecemeal, and it would be necessary to begin the trial all over again, whereupon the government withdrew its motion, the government could not thereafter assign error with respect to that matter.

**2. Eminent domain ⬤⟹145(1)—Benefit to riparian lands from river improvement must be estimated in view of contingent nature.**

In proceedings to condemn land for river improvement, the value of the benefits accruing to the riparian lands because of the improvement must be estimated in view of the elements of contingency and uncertainty, because the erection and use of wharves on such riparian lands would be subject to control by the government, and because the improvement itself might thereafter not be maintained, or might be radically changed.

**3. Eminent domain ⬤⟹262(5)—Over-emphasis on contingent character of riparian rights benefited held not prejudicial to government.**

The fact that the court, during the trial of proceedings to condemn a large number of tracts of land for a river improvement, over-emphasized the contingent character of the benefits accruing to the riparian lands by the improvement, was not so prejudicial as to require a reversal, where the charge on that matter was correct, the jury made substantial counter awards for benefits in many cases, and the government was satisfied with most of the awards, which were all affected by the same error.

**4. Eminent domain ⬤⟹204—Evidence as to cost of utilizing riparian rights along improved river held competent.**

In proceedings to condemn land for river improvement, where the government sought to set off against the damages the benefits which would accrue to the riparian lands by reason of the improvement, evidence of the cost of constructing unusual wharves along the shores, which would be necessary to make use of the riparian rights, was competent in determining the value of the benefits to the land.

**5. Evidence ⬤⟹142(2)—Evidence of sale price of lot 8 blocks from improved river is too remote to show value of lots condemned.**

In proceedings to condemn riparian lands for river improvement, evidence of the selling price of a parcel of land 8 or 10 blocks from the river was incompetent, for the reason that it was too remote and dissimilar.

**6. Eminent domain ⬤⟹262(5)—Admission of evidence of sale price too remote held not prejudicial.**

Error in admitting in condemnation proceedings evidence of the sale price of property which was too remote and dissimilar to be admissible for that purpose was not prejudicial to the government, so as to require a reversal of the awards, where the trial occupied 10 weeks, and the jury had seen the premises, knew the situation relative to the lot sold, and were instructed that it was near enough for them to say whether it was near enough and similar enough to be of any use to them in fixing the value, and the amounts fixed by them do not indicate that any particular attention was paid to the sale as a criterion.

**7. Evidence ⬤⟹200—Exclusion of admissions made in connection with materially different suggested improvement held not abuse of discretion.**

In proceedings to condemn land for a river improvement project, admissions as to benefits from improvement made by riparian owners, when the project was first considered and when it was materially different from the project finally executed, could be excluded by the trial court without abusing the discretion vested in it.

**8. Eminent domain ⬤⟹84—Gas main under channel is subject to removal without compensation.**

A gas main laid under a navigable channel is subject to removal for the purpose of improving the channel without compensation being paid to the gas company, so that it was error in proceedings to condemn the gas company's easement across the land bordering on the river, which was taken for improvement of the river, to admit evidence of the cost of the

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

laying of another gas main to supply the territory supplied by the main removed.

**9. Eminent domain ⬦255—Objection to evidence of value held to present question of compensation for removal of gas main.**

In proceedings to condemn riparian lands for river improvement purposes, where a gas company was required to remove its main laid under the river, and its easement across land to the river was condemned, an objection to the admission of evidence as to cost of laying a new gas main was sufficient to raise the question that the company was not entitled to compensation for the removal of its main from under the river.

In Error to the District Court for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Condemnation proceedings by the United States against the River Rouge Improvement Company and others. After awards by the jury in favor of a large number of property owners, the United States brings three writs of error to review sixteen of the awards. All of the awards but one affirmed, and verdict and judgment as to that award set aside for new trial.

Frank Murphy, Asst. U. S. Atty., of Detroit, Mich., and Alfred J. Murphy, Special Asst. Atty. Gen. (Howell Van Auken, of Detroit, Mich., and Wm. D. Riter, Asst. Atty. Gen., of Washington, D. C., on the brief), for the United States.

Chas. A. Wagner, Selden S. Dickinson, Paul B. Moody, Clifton G. Dyer, and Wm. F. Connolly, all of Detroit, Mich. (Angell, Turner & Dyer, Campbell, Bulkley & Ledyard, Corliss, Leete & Moody, Edward D. Devine, Donnelly, Hally, Lyster & Munro, Keena, Lightner, Oxtoby & Hanley, Monaghan, Crowley, Reilley & Kellogg, Stevenson, Carpenter, Butzel & Backus, Wilkinson & Hinkley, Charles A. Wagner, and Connolly & Henderson, all of Detroit, Mich., on the brief), for defendants in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge: The River Rouge empties into the Detroit river along the southwesterly edge of the city of Detroit. It was usable and was used for the purposes of navigation, but was narrow and winding and with a shallow channel. Projects for governmental improvements of the channel had long been under consideration. The Ford Motor Works and allied interests located a plant upon the river about 4 miles above its mouth, and this location furnished an additional, if not the main, reason justifying extensive and expensive improvements of the channel. The War Department engineers prepared a plan or project for the improvement, which contemplated widening and straightening the channel, so as to make it 290 feet wide, on top, with a depth of 21 feet, and a bottom width of 200 feet, and thus to accommodate the largest freighters running on the Great Lakes. Congress approved the project. Act Aug. 8, 1917, 40 Stat. 256, 258. Following what is said to have become the common precedent in such cases, Congress provided that the United States would pay for the excavation, but that the local interests must fur-

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

nish the right of way, and that, while the necessary condemnation for widening and straightening purposes might be pursued in the name of the United States, the amount of damages awarded should be paid by the local interests; and the circumstances of this case were such that the "local interests," upon which this obligation was placed, were the Ford companies. A condemnation suit, involving all the parcels of property to be taken for widening, was commenced in the District Court at Detroit in the name of the United States; and acting under the emergency clause of the statutes (Sec. 5, Act of July 18, 1918, 40 Stats. 911 [Comp. St. Ann. Supp. 1919, § 9878a]), the War Department proposed to take immediate possession.

A bill for injunction was filed; a preliminary injunction was refused, on condition that the Ford companies should pay into court in the condemnation case a sum sufficient to cover any awards which might be made; an appeal was taken to this court from that refusal; the judges of this court refused to stay the work pending that appeal. Later, the appeal was dismissed, the amounts in question paid into court, and the condemnation case proceeded. It was heard before the court and jury, and the jury made a large number of awards covering the several parcels involved. The property owners, respondents in the proceeding, were content. The United States, while satisfied with the most of the awards, now brings these three writs of error to review sixteen of them. Some of the assignments of error apply with equal force to each award, and the others have only specific application.

[1] The whole proceeding was one for the assessment of damages. The fact that the damages were to be paid by the Ford companies, instead of by the government, was not legally relevant to this assessment, and yet that fact appeared before the jury, both in the examination of jurors as to their fitness to sit and by comment made during the final arguments by counsel for two of the owners. Immediately upon the latter incident, counsel for the United States moved for an order declaring mistrial on account of this misconduct of counsel. Obviously this was the same subject-matter touched by the objections which had been made and the exceptions saved concerning the preliminary examination of the jury. The trial judge announced that he would grant the motion, but that the matter could not be tried piecemeal, and that it would therefore be necessary to begin the trial all over again. Thereupon counsel for United States withdrew their motion and the argument proceeded. It is entirely clear that the United States could not refuse the new trial which was offered to it on account of the error of which it complained on this subject, and proceed with the trial, and speculate as to the result, and then be heard in the Court of Appeals to complain of the same error, if error there was. The assignments as to this subject-matter are overruled.

The matter thought to be most important and chiefly argued for the government pertains to a consideration of those special benefits to the property owners which might rightly be set off against the value of the property taken. To be specific, a typical property owner had 100 feet frontage upon the old River Rouge, extending back 500 feet. The

100-foot strip of land necessary to widen the river was taken entirely from the front part of his property, leaving him with a parcel 400 feet deep fronting upon the improved river, which, in effect, was to be converted into a slip 4 miles long. It was the theory of the United States that the parcel remaining after the improvement was worth more than the original parcel and that there were no net damages to be awarded for the taking. The complaints are that the trial judge both took the wrong view as to the character of the eventual riparian rights and admitted improper evidence in determining their value. To the first contention the owners reply by saying that this statute permitted the jury to consider only direct and special benefits; that the existing benefits here were shared by the typical parcel in the same degree in common with all other property fronting on the improvement, and in a less degree in common with all other property in the neighborhood; and that it would follow that if there were error pertaining to the subject of these benefits, it would be immaterial. We do not find it necessary to pass upon this reply, since we have reached the conclusion that there was no substantial error on this subject.

[2] It is obvious that the riparian rights involved in the frontage upon the improved river would normally be greater than the corresponding ones upon the old river; but it is equally clear that these rights, after the improvement as well as before, were not of the absolute nature pertaining to ordinary land, but carried elements of contingency and possibly fatal germs which must be considered in estimating their value, and upon which it was right to instruct the jury. The practical way in which these particular rights could be made of value would be by using them for wharf and dockage purposes. All uses of that character must continue subject to the dominant public right of navigation, and any wharf built out from the shore could be at any time removed without compensation to the owner, if its removal should be decided to be desirable in the interest of navigation. Any use of frontage by way of dockage might be rendered valueless by regulations which, for example, might require that space to be kept clear for moving boats. That these suggestions were not wholly unlikely is apparent upon the facts of this case, which indicate that wharves running out into the channel were not to be permitted, and that in one instance the frontage was so shut in at both ends by bridges that there would not be room to dock large boats.

Perhaps even more forceful is the fact that such benefits are always likely to be minimized by a failure to maintain the channel in its best efficiency. The Great Lakes and connecting waters are spotted with harbor improvements ordered by Congress but now worthless because abandoned. The annual expense of maintaining the channel will be substantial. The "local interests" may decline to pay it and Congress may refuse. The improvement of the Detroit river—as by canalization, seriously proposed—might necessitate vital changes in the Rouge channel, to be made upon such terms as Congress might impose. All these are only a few among many contingencies. In this situation, the owners were entitled to instructions—if these benefits were to be considered at all—that, in determining the value of the riparian

rights added by the improvement, the jury should take into account their uncertain and contingent character and the reasonable liability that they might be lessened or destroyed by future governmental action or nonaction. This charge was given, and we do not find that the charge itself went beyond a proper limit in defining and pointing out these elements of contingency. Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; U. S. v. Chandler-Dunbar Co., 229 U. S. 53, 33 Sup. Ct. 667, 57 L. Ed. 1063.

[3] During the progress of the trial and discussions as to evidence, the court repeatedly expressed his view as to the contingent and speculative character of these rights, and did so somewhat more emphatically than in the final charge. We think these elements of uncertainty were in this way over-emphasized, but that is the worst that can be said. There is no express instruction that the government may act arbitrarily and capriciously in refusing the exercise of ordinary riparian rights. We may assume that a holding to that effect would have been error, although any recovery of damages upon the theory that the action of Congress or the President, in taking away normal riparian rights in the course of a declared improvement of navigation, had been in truth capricious or arbitrary, would be full of difficulty. See Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 268, 35 Sup. Ct. 551, 59 L. Ed. 939. We content ourselves by saying that, considering the unquestioned dominance of the public navigation right, the frequency with which that right is exercised as an incident to a general benefit, although to the prejudice of individual riparian owners and without compensation, the more moderate statement of the rule by the final charge, the fact that though all the awards were subject to the same criticism, the government is content with most of them, and the fact that the jury clearly did, in many cases, make substantial counter awards for benefits, we cannot think any over-emphasis given to this contingent character was sufficiently prejudicial to call for reversal.

[4] The controversy over the admitting of evidence on this subject arises in this way: According to the plans of the improvement, when it was finished there would be on each side an underwater bank called the "berm," 45 feet wide and rising about 21 feet to the surface at the edge of the channel. It was part of the project that no wharves whatever could be extended out from the shore, but that the riparian who desired to bring boats to his property must excavate this berm at his own expense and must construct along the edge of his bank a dock or revetment extending vertically from the surface down 21 feet, or indeed deeper, in order to get the necessary footing. Evidence was received as to what it would cost the owners to do this excavating and revetment building. This was upon the theory that the value to the property of the improvement could not be intelligently determined without knowing the cost of the additional private work which must be done before any benefit could be derived. Of course, the ultimate question was as to the ultimate benefit, and the testimony might have stopped with the general conclusion of an expert upon values; but these same facts would have been properly brought out upon that ex-

pert's cross-examination, and we see no objection to proving them directly. It is true that the cost of building the revetment would have added to the value of the parcel; but this addition might or might not have been as much as the cost, and this consideration does not prevent the cost from being one of the elements that ought to be considered in assessing the benefits. We think there was no error upon this subject.

[5, 6] Evidence was received regarding the selling price of a parcel of land on Oak street 8 or 10 blocks away from the river. A motion to strike out this testimony, for the reason that the property was too remote and dissimilar, was denied. We think it should have been granted; but it does not follow that there was thereby sufficient prejudice to justify a reversal and a new trial. The trial occupied 10 weeks; the jury saw the premises and knew the situation relative to the lot sold; facts and circumstances in great variety were before the jury to be considered in assessing value; the court instructed the jury that it was for them to say whether this parcel sold was near enough and similar enough to be of any use to them in fixing the value; and the amounts fixed do not indicate that any particular attention was paid to this sale as a criterion. We must think that the effect of this testimony naturally would be and probably was relatively negligible, and so not to be considered prejudicial error. Judicial Code, § 269, as amended February 26, 1919, 40 Stat. 1181 (Comp. St. Ann. Supp. 1919, § 1246).

[7] Complaint is also made because the court excluded certain letters which had been written by or for some of the property owners and which were thought to be admissions of benefit. In an inquest or assessment of damages—as this was—indefinite admissions of benefits made 3 or 4 years before, and in reference to a project of improvement materially different, would be at the best rather remote evidence as to what the actual benefits were under the plan as it finally took shape. There was at the time of these admissions, so far as the record shows, no understanding that the riparian owners would be compelled to excavate the berm and build revetments before they could get the benefit of the improvements, and this consideration alone—assuming that the letters were otherwise admissible—would make what the owners thereby conceded as to benefits so uncertain in its application to the present situation, that the exclusion of these letters was not beyond the court's discretion.

The Detroit City Gas Company had a gas main passing underneath the river at Jefferson avenue; it reached the edge of the river by right of way over 85 feet in depth of one of the condemned parcels. Its only interest in the parcel was therefore an easement. For this interest the jury awarded the gas company about $12,500. Evidence was received that, in order to serve the territory beyond the river which had been supplied by this main, the company built on the further side of the river a cross-main of considerable length, tapping another main which crossed the river at another point, and that this method of supplying this territory was, upon the whole, better than it would have been to lay a new main underneath the improved channel at the old point of

crossing. The cost of laying this cross-main was received in evidence, and it was the only proof in the case tending to show the value of the easement taken, except the proof of the cost of reconstruction on the Jefferson avenue line.

[8, 9] In receiving all this evidence as to reconstruction value there was error. The objection made and overruled necessarily involved the true measure of value of the thing taken. The substantial injury done the gas company was the enforced removal and destruction of the main across the river at Jefferson avenue, and the condemnation of its existing right to maintain its pipe upon 85 feet of private property was a mere incident of this destruction. For the substantial injury there could be no recovery, since this main under the navigable channel was always subject to removal upon the government's demand in the improvement of navigation, without compensation. Louisville Bridge Case, 242 U. S. 409, 37 Sup. Ct. 158, 61 L. Ed. 395. The result of the verdict is that the company, in another form, gets compensation for that same injury; and this result follows, at least in part, from the admission of the evidence as to the cost of reconstruction or substitute. It is therefore open to us to notice the question as to measure of damages although it is raised only in this indirect manner.

All that could be awarded upon this condemnation, for the value of this easement, would be its market value, as measured by the market value of the new easement; if any, which it might be necessary to get in order to bring the existing main up to the edge of the improved channel, so that it could have been there relaid across the channel in the old size and location if the company had so desired. Whether any such new easement would be necessary is not apparent on this record.

We have given attention to several other errors assigned, but we find nothing in them of substance sufficient to justify a further trial. All the awards will be affirmed, excepting the one to the Detroit City Gas Company. As to that, the verdict and judgment will be set aside, and a new trial will be had if it is desired. It evidently will not be necessary to retain in court any of the funds deposited, except so far as is necessary to protect the interests of the gas company. Its interests in a proceeding of this kind are so far several in fact that the affirmance as to every other party is final, leaving no other controversy open in the court below.

No costs are awarded in this court.