**150**

UNITED STATES of America,
Plaintiff,

v.

**85,237 ACRES OF LAND, MORE OR
LESS, IN ZAPATA COUNTY, TEXAS,**
Flumencio Munoz, et al., Defendants.

Civ. A. No. 529.

United States District Court
S. D. Texas,
Laredo Division.

March 9, 1957.

Judgment Affirmed Feb. 11, 1958.

See 252 F.2d 116.

Malcolm R. Wilkey, U. S. Atty., Houston, Tex., Charles L. Short, Asst. U. S. Atty., Laredo, Tex., Robert M. McKee,. Attorney, Dept. of Justice, Washington, D. C., for plaintiff.

Bobbitt, Brite & Bobbitt (Robert L. Bobbitt, Jr.), San Antonio, Tex., for defendant, Guerrero-Zapata Bridge Co.

ALLRED, District Judge.

The great "Falcon Dam and Reservoir," constructed on the Rio Grande River by the United States and Mexico, inundated a toll bridge belonging to Guerrero-Zapata Bridge Company (hereinafter called Bridge Company). The question [1] here is whether the Bridge

---

1. As printed for publication, this opinion omits some matters discussed in the original as filed concerning preliminary orders and memorandum opinions.

Company is entitled to compensation for the value of the property including the franchise, or for the land and improvements only. The matter was referred to a Special Commission, under Rule 71A (h), Federal Rules of Civil Procedure, 28 U.S.C.A., with instructions to fix values on both theories. The Special Commission's report [2] fixed a value of $7,000 for the properties without the franchise, $21,300 with it.

The Bridge Company moves for judgment upon the findings of the Commission for $21,300. The Government moves that judgment be entered for $7,000, found by the commissioners in support of defendants' theory; alternatively, the Government objects to the report of the Commissioners as not supported by the evidence.[3]

By an Act dated May 13, 1924, c. 153, § 1 et seq., 43 Stat. 118, 22 U.S.C.A. § 277 et seq., Congress authorized the President to appoint representatives to cooperate with representatives of Mexico in a study regarding the equitable use of the waters of the Lower Rio Grande, the Lower Colorado and Tia Juana Rivers, to be used as the basis for negotiation of a Treaty between the two countries relative to the use of the waters of these rivers and matters closely related thereto. An initial appropriation was made at the time the Act was passed and supplemental appropriations have been made each year since 1924.

The authorized negotiations culminated in a Treaty dated February 3, 1944, effective November 8, 1945 and a protocol supplementary thereto, Nov. 14, 1944, 59 Stat. 1219.

Meantime, after original authorization of the study looking to the Treaty, Congress passed an Act of March 29, 1928, authorizing the Bridge Company's predecessor to construct, maintain and operate

2. "Report of Special Commission

"The findings herein relate to the above parcel known as the Guerrero-Zapata Bridge, and accord with our understanding of the instructions given by the U. S. District Court upon referral of this matter. We make the following specific findings:

"1. The bridge is not susceptible of evaluation on the basis of comparable sales, there being no evidence to support a finding.

"2. Having heard evidence of reproduction cost less depreciation, we find that a reasonably prudent person would not undertake construction of the bridge under the facts and circumstances existing at the time of plaintiff's taking, and just compensation cannot be primarily measured on this basis.

"3. The physical property consisting of land and improvements located thereon, including that portion of the bridge belonging to defendants, had at the time of plaintiff's taking a fair cash market value of $7,000.00.

"We have decided to make findings under both plaintiff and defendants' theories, as we conceive them to be, of the just compensation for the physical property and franchise value of the property. We understand the plaintiff to contend that an informed buyer would have known or should have known at the time of taking that Falcon Dam was being built, and would occasion the removal or destruction of the bridge, and further that the right and authority to operate and maintain the bridge was contingent upon the Act of 1928, Public Law No. 220, 70th Congress [45 Stat. 387] which Act reserved the right to repeal the authority. Under this theory we find the physical and franchise value of the parcel to be $7,000.00.

"Under defendants' theory, and disregarding any effect that the condemnation proceedings may have had upon the value, which is a way of saying that an informed buyer would have no apprehension as to revocation of authority given under the Act referred to above, we find the physical and franchise value of the parcel to be $21,300.00.

"It is not for us to decide, but it appears that plaintiff asserts, because of its condemnation, that the franchise was of no value. We do not know if the right to operate and maintain the bridge was ever repealed by any authoritative act other than condemnation, but if it was not, then we believe that the powers exercised by the plaintiff effectively took value from the defendant, and defendant should be justly compensated therefor.

"Filed on this the 10th day of December, 1956."

3. No transcript of the evidence has been furnished for review.

a toll bridge across the Rio Grande River " * * * so far as the United States has jurisdiction over the waters of such river, *at a point suitable to the interests of navigation,* at or near Zapata, Texas, *in accordance with the provisions of the Act entitled* 'An Act to regulate the construction of bridges over navigable waters,' approved March 23, 1906, subject to the conditions and limitations contained in this Act, and subject to the approval of the proper authorities in Mexico." [4] The Act of 1928 conferred the power of eminent domain upon the Bridge Company, and authorized the charging of tolls in accordance with any applicable Texas law, which should continue to be the legal rates until changed by the Secretary of War under authority contained in the Act of March 23, 1906, 33 U.S.C.A. § 491 et seq. The Act granted the right to sell or transfer the franchise and *expressly reserved: "The right to alter, amend, or repeal this Act * * *"*.

The bridge was built, acquired by defendant Bridge Company in 1941 and operated as a toll bridge until August 30, 1953 when, as a result of the impounding of the waters behind Falcon Dam (constructed under the Treaty with Mexico), the bridge and the land on which it was located was submerged. The Government had filed this action December 29, 1949, seeking to take for the public use for the construction and maintenance of such dam the 85,237 acres of land involved herein which included approximately 5 acres of land owned by the Bridge Company. Neither the 5 acres nor the bridge was described in the Government's pleadings but the 5 acres was included within the total acreage condemned; and the footings of the toll bridge were located on the 5 acres.

The dispute at the present time as to the amount to be adjudged on the findings of the Commissioners depends upon whether the Bridge Company is entitled to recover for the value of its franchise. The Government, conceding that the Bridge Company is entitled to compensation for its five acres and the physical structures thereon, contends that, since the very act authorizing construction and maintenance of the bridge expressly reserved the right of repeal, the Bridge Company is not entitled to anything at all for the franchise. The Bridge Company, on the other hand, asserts that it is entitled to recover for the fair value of the franchise since Congress had not repealed the Act of 1928.

The Bridge Company's position is that the correct measure of damages is the fair market value, including not merely the physical structure of the bridge and the land on which it rested but the value of the unrevoked franchise as well;[5] that, as the court instructed the Commissioners, the power of Congress to revoke or repeal the franchise, and the possibility of such repeal, was a *factor* to be considered in fixing values;[6] but, since it had not been repealed or revoked, it constituted a valuable asset which could not be taken by the Government without payment of just compensation. The Bridge Company principally relies on the exhaustive landmark, often explained and distinguished, case of Monongahela Navigation Company v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463.[7] The *holding* of the lengthy opinion in that case is best summarized (if it can be summarized) in Louisville Bridge Co. v. United States, 242 U.S. 409, 421 to 423, 37 S.Ct. 158, 161–162, 61 L.Ed. 395, as follows:

"Appellant cites Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, but it is plainly distinguishable. There the Navigation Company un-

---

4. Emphasis mine throughout unless otherwise indicated.

5. 29 C.J.S. Eminent Domain § 144, p. 991.

6. Brooklyn Eastern District Terminal v.

City of New York, 2 Cir., 139 F.2d 1007, 152 A.L.R. 296.

7. From which Chief Judge Hutcheson of this circuit recently quoted with approval in Slattery Company v. United States, 5 Cir., 231 F.2d 37–50.

der a *state* charter had constructed locks and dams in the Monongahela river, to the great improvement of its navigation, and by a supplement to its charter had been required to commence the construction of lock and dam No. 7 in such manner and on such plan as would extend the navigation from its then present terminus to the state line. This work was to complete the company's improvements in the state of Pennsylvania. Thereafter Congress, in 1881, appropriated $25,000 for improving the Monongahela river in West Virginia and Pennsylvania, with the proviso that the money should not be expended until the Navigation Company had undertaken in good faith the building of lock and dam No. 7 and had given assurance to the Secretary of War of its ability and purpose to complete the same. The company gave satisfactory assurance to the Secretary, commenced the work in 1882, and completed it in 1884. By Act of August 11, 1888, c. 860, 25 Stat. 400, 411, Congress authorized the Secretary of War to purchase this lock and dam from the company, and in the event of his inability to make a voluntary purchase within a specified limit of expense, then to take proceedings for their condemnation, *with a proviso that, in estimating the sum to be paid by the United States, the franchise of the corporation to collect tolls should not be considered or estimated.* It appeared that the tolls received by the company for the use of its works, including lock and dam No. 7, averaged $240,000 per annum, that the money value of the entire works and franchise was not less than $4,000,000, and that the actual toll receipts of lock and dam No. 7 were in excess of $2,800 per annum, and would probably increase in the near future.

*This court held the proviso excluding the franchise to collect tolls from consideration in the condemnation proceedings to be inconsistent with the 5th Amendment* [148 U.S. at page 336, 13 S.Ct. at page 630]. But it will be observed that this was not a case of removing a structure from the river on the ground that it interfered with navigation, but *a taking over of a structure and employing it in the public use as an instrumentality of navigation.* In short, there was a clear taking of the property of the company for public use as property, and an attempt at the same time to exclude from consideration an essential element of its value when ascertaining the compensation to be paid."

The Monongahela case is also distinguishable because, as pointed out (148 U.S. at pages 338–341, 13 S.Ct. at pages 631–632), there was no reservation by Congress of a right to withdraw its assent in the interest of navigation, as there had been in Bridge Company v. United States, 105 U.S. 470, 26 L.Ed. 1143. Here the right to repeal, alter or amend is *unlimited,* not confined to navigation.

In Louisville Bridge Co. v. United States, 242 U.S. 409, 37 S.Ct. 158, 61 L.Ed. 395, the company had built a bridge across the Ohio River under authority of Acts of Congress in 1862 and 1865 which, unlike the act here involved, contained no reservation of right to repeal or alter. Later the Secretary of War, acting under authority of an act of March 3, 1899,[8] held hearings and ordered alterations so that the bridge would not obstruct navigation. The court held that the original Acts of 1862 and 1865 did not operate to confer an irrepealable franchise on the bridge company or create a vested right to compensation under the Fifth Amendment.

It is clear, therefore, that under the Louisville Bridge and other cases,[9] the

---

8. Now 33 U.S.C.A. § 401 et seq.

9. United States v. Wauna Toll Bridge Co., 9 Cir., 130 F.2d 855, and other cases listed in footnote 5 of Osborne

Bridge Company here could not claim compensation for the franchise had Congress repealed the Act or if the Secretary of War had required the bridge to be altered or even removed in the interest of navigation. The taking here, however, was not in aid of navigation but a result of the building of Falcon Dam pursuant to the Treaty with Mexico.[10]

Plaintiff takes the position that the filing of the declaration of taking here operates to repeal the franchise granted by Congress (by the Act of March 29, 1928), just as effectively as an outright repeal by Congress, citing United States v. Cox, 10 Cir., 190 F.2d 293, 296, holding that a declaration of taking operated to cancel grazing permits issued under the Taylor Grazing Act of June 28, 1934, 43 U.S.C.A. § 315 et seq. The court there said:

"But, in our view, there can be no legally significant difference in the withdrawal of the permits for war purposes by the Secretary of the Interior, as in the Osborne case, and the cancellation of the permits by a declaration of taking in condemnation proceedings. In either case, the Government, by appropriate action, has exercised its unquestionable power to take only that which it owns, and in which the condemnee has no compensable interest. *It was noncompensable hardships of this kind which prompted the Con-gress to amend the Taylor Grazing Act to provide for the administrative determination and payment for losses suffered from the cancellation of the grazing permits for war purposes, i. e. Section 315q, Title 43 U.S.C.A.*"

The Bridge Company distinguishes the Cox and Osborne[11] cases by the fact, emphasized above, that Congress had provided for administrative determination of compensation when grazing permits were cancelled. But that fact is not determinative of the question involved here, which is: did the declaration of taking filed in this action operate to repeal the Bridge Company's franchise? The franchise in this case, as the permits in Cox and Osborne, was revocable by the Government without liability. Congress amended the Taylor Act so as to compensate for hardship caused by revocation of the grazing permits. It has not done so with regard to a cancelled or "frustrated"[12] toll bridge franchise.

■ It is of course elementary that ordinarily the fact that property is, or is about to be, condemned for public purposes does not diminish or destroy its value. But that principle is hardly applicable where the thing condemned is the property of the condemner, or is subject to termination at the will of the condemner, as here. Likewise, repeal by implication of either a statute or a franchise is not favored. Yet here there

v. United States, 9 Cir., 145 F.2d 892, 896, in support of the statement that "Numerous instances are to be found where permits issued by a sovereign are highly valuable as between private persons but which may be revoked by the sovereign without the payment of compensation: e. g. bridge franchises."

10. Cf. United States v. Wheeler Tp., 8 Cir., 66 F.2d 977. The Treaty here took into account, in the preamble, "the fact that Articles VI and VII of the Treaty of Peace, Friendship and Limits between the United States of America and the United Mexican States signed at Guadalupe Hidalgo on February 2, 1848, and Article IV of the boundary treaty between the two countries signed at the City of Mexico December 30, 1853 reg-ulate the waters of the Rio Grande (Rio Bravo) and the Colorado River *for purposes of navigation only;*" * * * and recited, as the purpose of the present Treaty, "to fix and delimit the rights of the two countries wih respect to the waters * * * of the Rio Grande * * * in order to obtain the most complete and satisfactory utilization thereof * * *." Hidalgo County Water Control & Imp. Dist. No. 7 v. Hedrick, 5 Cir., 226 F.2d 1, 3.

11. 9 Cir., 145 F.2d 892.

12. Cf. United States ex rel. and for Use of Tennessee Valley Authority v. Birmingham Ferry Co., D.C.Ky., 79 F.Supp. 569, 573.

is an irreconcilable conflict between continuance of the revocable bridge franchise granted by Congress and the building of the great Falcon Dam for the storage and handling of international waters which rendered it impossible for the toll bridge to continue. The parties have stipulated that the bridge structure, except for the towers, including the approaches, footings, foundations, abutments and appurtenant buildings, were and have remained, since August 30, 1953, submerged. I think I may take judicial notice of the fact that the towns of Zapata, Texas, and Guerrero, Mexico, which were connected by the toll bridge, likewise were and are submerged by the impounded waters; and that it was known for many years before that they and the bridge would be submerged once the dam was completed and the rains came.

Falcon Dam was built pursuant to the Treaty and the Acts of Congress, beginning in 1924, authorizing and implementing the Treaty. It is idle to contend that Congress intended to continue the Bridge Company's franchise beyond the completion of the dam and impounding of the waters. The Treaty became a part of the Supreme Law of the Land. Art. VI, clause 2, of the Constitution reads in part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; * * *."

 Treaties and acts of Congress are on the same footing and either may supersede the other, usually dependent on which is later in date.[13] Here the treaty and the implementing Acts of Congress are subsequent to the Bridge Company's franchise of 1928. Its continued exercise is in irreconcilable conflict with the Treaty, the implementing acts of Congress and the works that have been done pursuant thereto. No express repeal was necessary under these circumstances.

What was said in United States v. Cox, supra, is applicable in principle here— "the Government, by appropriate action, has exercised its unquestionable power to take only that which it owns, and in which the condemnee (Bridge Company) has no compensable interest."

The special commission has found that the value of Bridge Company's property, excluding the franchise, was $7,000. The court's judgment will be for that amount.

The Clerk will notify counsel to submit an order accordingly.

---

13. Cf. the general statements in 87 C.J.S. Treaties § 18a, p. 943.