**NANTAHALA POWER AND LIGHT COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 11023.**

United States Court of Appeals
Fourth Circuit.

Argued May 2, 1967.

Decided Sept. 14, 1967.

---

Randall J. LeBoeuf, Jr., New York City (Halcyon G. Skinner and Ronald D. Jones, and LeBoeuf, Lamb & Leiby, New York City, on brief) for petitioner.

John C. Mason, Deputy Gen. Counsel, F. P. C. (Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, Joseph B. Hobbs and George F. Bruder, Attys., F. P. C., on brief) for respondent.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

SOBELOFF, Circuit Judge:

Under the decision of the Supreme Court in F. P. C. v. Union Electric Co. (Taum Sauk), 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965), hydroelectric developments situated on the headwaters and tributaries of navigable waterways, and previously thought to be beyond the licensing authority of the Federal Power Commission because they did not affect "downstream navigability," were brought within the ambit of the Commission's jurisdiction if they "generate energy for an interstate power system." [1]

---

1. F. P. C. v. Union Electric Co. (Taum Sauk), 381 U.S. 90, 95, 85 S.Ct. 1253, 1256 (1965).

Commission licenses must be obtained prior to the construction of a facility which the Commission finds will affect "the interests of interstate or foreign commerce." Federal Power Act, § 23(b), 16 U.S.C. § 817(b).

Before *Taum Sauk*, the Commission had uniformly held that the only "commerce" that was relevant in determining its jurisdiction under section 23(b) was commerce on the downstream navigable waterway. In *Taum Sauk*, the Commission expanded its horizons to include, as affecting commerce, projects utilizing water power for the interstate transmission of electricity,

Petitioner's facilities were built before *Taum Sauk* and the Commission had erroneously held them free from the licensing and provisions of section 23(b) of the Federal Power Act, 16 U.S.C. § 817(b),[2] because of the Commission's view of the law at that time that since they did not affect "downstream navigability," it followed that they could not bear the necessary relationship to interstate commerce. The question for decision is whether these facilities may now be subjected to the licensing provisions if they in fact affect interstate commerce, thus satisfying the expanded jurisdictional base announced in *Taum Sauk*.

From 1940 to 1949, Nantahala Power and Light Company, a wholly-owned subsidiary of the Aluminum Company of America (ALCOA), filed with the Commission in accordance with section 23(b) "declarations of intention" to construct seven hydroelectric developments in the Little Tennessee River basin. After investigation, the Commission found that none of the proposed developments would affect "the interests of interstate or foreign commerce," which, at that time, meant only that the Commission apprehended no effect on downstream navigability. Construction of the facilities without licenses was accordingly authorized by the Commission, upon compliance with state law. The last of the seven developments was completed in 1955.

Shortly after the decision in *Taum Sauk,* the Commission wrote to owners of unlicensed hydroelectric developments, including the petitioner, requesting them to file license applications for facilities which that decision brought within the purview of the Commission. Nantahala responded with a petition for a declaratory order that its seven developments were exempt from the licensing provisions of the Act. Accepting for purposes of decision the facts as set forth in Nantahala's petition, the Commission held that licenses were obligatory. The present appeal followed denial of Nantahala's petition for reconsideration.

In our court, Nantahala renews the three arguments it presented to the Commission, and we shall deal with each in turn.[3]

## I

Petitioner's principal contention is that a Commission finding under section 23 (b) that a proposed facility would not affect commerce clothes the developer with irrevocable congressional permission to construct and operate the development, without his ever needing to apply for and obtain a license.

 Nantahala acknowledges the principle, as indeed it must, that it is

---

27 F.P.C. 801 (1962), and the Supreme Court upheld the Commission's view of the scope of its jurisdiction. F. P. C. v. Union Electric Co. (Taum Sauk), supra.

2. Section 23(b) provides in pertinent part that:

"Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this Act. If the Commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws."

3. Nantahala concedes that the seven developments "generate energy for an interstate power system." If the present appeal is decided adversely to Nantahala, they are therefore within the Commission's jurisdiction, as defined by *Taum Sauk.*

within the power of Congress to delegate to the Commission authority periodically to review and revise the status of developments earlier found not to affect commerce;[4] if a change in the facts or the law warranted, the Commission could then require that licenses be secured.[5] It maintains, however, that a uniform course of Commission interpretation, as well as the legislative history of the Act, supports the view that Congress expressly refrained from vesting the Commission with continuing supervisory jurisdiction, once it has determined that the development would not affect commerce.

In harnessing the latent power in our thousands of waterways, complex problems emerge regarding the most efficient methods of creating and channeling into a unified system the immense volume of kilowatt hours of energy required to meet the needs of the nation. Through the imaginative exercise of its broad regulatory authority, which in significant measure is implemented by the imposition upon licensees of various terms and conditions of operation, the Commission plays a vital role in insuring that our power supply is kept apace with the demand.[6] The recent black-out of the northeastern section of the United States furnishes dramatic illustration of the vital national interest in the proper regulation of facilities for the generation of electricity. It is therefore not without good reason that a court will hesitate to read into section 23(b) a congressional purpose to grant to Nantahala, and similarly situated owners, an indefeasible right to be free from the licensing provisions of the Act.

To counter the force of these considerations, petitioner mounts the argument, based upon early statements by the Commission and its employees and testimony before Congress, that in order to foster private investment in the development of electrical energy, Congress deliberately chose to offer to investors the incentive of license-free operation, after an initial Commission determination that the proposed facilities would not affect commerce. Nantahala states that it constructed the seven developments with which we are here concerned in reliance upon the prospect of independence from the burdens of licensed operation, and that this reliance interest is entitled to protection.

A sampling of the statements and testimony stressed by Nantahala as underpinning its position is helpful in illuminating the present controversy. The First Annual Report of the Commission,

---

4. See Lichter v. United States, 334 U.S. 742, 778, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948):

 "*A constitutional power implies a power of delegation of authority under it sufficient to effect its purposes.*" (Emphasis in original.)

5. See Louisville Bridge Co. v. United States, 242 U.S. 409, 37 S.Ct. 158, 61 L. Ed. 395 (1917).

6. A representative sampling of the conditions of operation imposed upon licensees is contained in Nantahala's brief. Among the Commission's "Standard License Conditions" are the following:

 "1. Licensee may be required at any time to install additional capacity or make other changes in the plants.

 2. Licensee must accept Federal Power Commission plans for coordinating its system operations with area utility operations.

 3. Licensee may be required at any time to construct and operate facilities for the conservation and development of fish and wild life resources and other recreation purposes, to construct preventive works for soil erosion, and to install stream gaging stations.

 4. Licensee may not lease or sell property used or useful for project operations without Commission approval.

 5. Licensee must permit reasonable use of its project by others for industrial, municipal and other purposes.

 6. Upon abandonment, licensee must remove all structures from the stream. (*Standard License Conditions*, Form L–11, 34 F.P.C. 602, 1965)."

 In addition, of course, there are enormously important controls over corporate financing and rate-making for the protection of the consuming public. See notes 32 and 33 infra and accompanying text.

published in 1921, contained the following observation:

"If the Commission finds that the interests of interstate or foreign commerce are not affected, the act grants authority to proceed in compliance with State law, and the declarant is freed from any subsequent liability to the United States under any existing or future acts of Congress regardless of conditions that may thereafter arise * * *. It is only when a declaration [of intention] is filed and a decision rendered in the manner prescribed in the act that the finding of the Commission becomes conclusive and binding both upon the declarant and the United States." [7]

Three years later the Commission commented:

"Under these earlier statutes and decisions there was reserved a continuing power to the Secretary of War to require the removal or alteration of obstructions to accommodate changes in the mode of navigation or in the extent of use dependent upon economic conditions. [Citation omitted.] Section 23 of the Federal water power act was an evident effort to give to power structures in nonnavigable streams a more certain tenure. Once the structure was authorized under this section it becomes impossible for the Secretary of War to order changes to accommodate a traffic created by changed conditions." [8]

In 1927, the Chief Counsel of the Commission identified two purposes to be served by section 23, as follows:

"(1) to protect the interests of navigation * * * (2) to protect appli-

cants by providing a means whereby they can have an authoritative ruling before investment is made." [9]

The views expressed in the above quoted statements were, petitioner asserts, presented to, and accepted by, Congress in 1935 during consideration of the Federal Power Act. They were submitted by the Solicitor of the Commission in the following language:

"The effect of section 23 is to permit a proper determination in advance of the construction of the project as to whether or not it will affect interstate and foreign commerce. That determination having been made, a license is required or it is not required under the act according to the facts that are shown. If it is a fact that interstate or foreign commerce will not be affected *the construction work* can be done, without a license. If the facts show that interstate or foreign commerce will be affected *the construction work* cannot be done without a license." [10] (Emphasis added; the significance of the italicized language is discussed later in this opinion.)

Petitioner also points to testimony before a House Subcommittee in 1947, some years after the passage of the 1935 Act, by the General Counsel of the Commission, to the effect that:

"The Commission cannot reserve jurisdiction under the Federal Power Act. If they find the proposed development does not affect interstate commerce, it cannot reserve jurisdiction." [11]

We are not persuaded that these expressions establish a consistent course of Commission interpretation, or

---

7. 1 FPC Ann.Rep. 54 (1921).
 Under section 23 of the Federal Water Power Act, 41 Stat. 1075 (1920), the filing of declarations of intention was discretionary. When section 23 was incorporated into section 23(b) of the Federal Water Power Act, 49 Stat. 846 (1935), 16 U.S.C. § 817 (1964), it was amended to impose mandatory filing of declarations of intention.

8. FPC, Decisions of the Federal Power Commission on Declarations of Intention

Under Section 23 of the Federal Water Power Act, at 36 (1926).

9. 7 FPC Ann.Rep. 155 (1927).

10. Hearings on H.R. 5423 before the House Interstate and Foreign Commerce Comm., 74th Cong., 1st Sess., at 472 (1935).

11. Hearings on H.R. 2972 and H.R. 2973 Before the Subcomm. of the House Comm. on Interstate and Foreign Commerce, 80th Cong., 1st Sess., at 443 (1947).

provide substantial support for a finding that the last sentence of section 23 (b) manifests congressional approval of the position urged upon us. More significant, more precise and more authoritative than the observations of the Commission and its employees is the unadorned language of the Act.[12] With respect to a development whose operation the Commission has determined will affect commerce, the penultimate sentence of section 23(b) provides that the developer "shall not construct, maintain, or operate such dam or other project * * * until it shall 'have applied for and shall have received a license * * *." In striking contrast, if the Commission finds that the project will *not* affect commerce, the final sentence of that section only authorizes the developer to "construct such dam * * * upon compliance with State laws."

Interpreted literally, deletion from the latter phrase of the words "maintain or operate" would support the conclusion that Congress meant to permit license-free "construction" only of developments found to have no presently discernible effect on commerce; "maintenance and operation" would still be subject to the licensing provisions. With Nantahala, however, we are of the view that a purely linguistic approach would not fully satisfy the search for the congressional scheme. But we do not agree with the suggestion in petitioner's brief that the words "maintain or operate" were deleted because "Congress assumed that if there were no effect on interstate or foreign commerce, the proposed dam would not be subject to any of the numerous requirements imposed upon licensees." One should hesitate to attribute to Congress a vision so shortsighted, designedly excluding the possibility that changed circumstances may create an effect on commerce where none previously existed. It is more reasonable to inquire whether, in the circumstances, there is justification for refusing to give any tangible effect to the obvious modification of parallel clauses in consecutive sentences.

It requires no subtle straining to arrive at a more sensible interpretation of section 23, in light of the history and purpose of the Act. Our view can be succinctly stated in the following propositions:

 ▪ (1) Once a finding of lack of effect on commerce ,is made, section 23 (b) authorizes the developer to construct the facility without a license.

 ▪ (2) Construction having been completed, the Commission is without authority later to say that the finding of lack of effect on commerce was in error and that therefore the developer violated the law by failing to obtain a license.

 ▪ (3) As long as the Commission adheres to the view that the development has no effect on commerce, license-free maintenance and operation of the facility is authorized.

 ▪ (4) When, however, the Commission determines that a change in the underlying facts, or a correct exposition of the applicable law, discloses that the facility does affect commerce, continued maintenance and operation is conditioned upon the procurement of a license.

 ▪ Once the development is found to affect commerce, no grant of immunity from licensing can fairly be implied for maintenance and operation, as well as construction.

The Federal Power Act of 1935 was "[t]he outgrowth of a widely supported effort of the conservationists to se-

---

12. Even were we satisfied that there was a consistent course of Commission interpretation supporting Nantahala's contention, "consistent error is still error," Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 678 n. 5, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), and neither the Commission nor the courts would be precluded from correcting an erroneous interpretation of the law, as evidenced by the Commission's decision in *Taum Sauk*, upheld by the Supreme Court. See also Louisville & Nashville R.R. v. United States, 282 U.S. 740, 759, 51 S.Ct. 297, 75 L.Ed. 672 (1931).

cure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, * * * instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.

It was the major undertaking involving a major change in national policy. (Footnote omitted.)"

First Iowa Hydro-Elec. Co-op. v. F.P.C., 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1647 (1946).

■ Consistent with this felt need, section 23(b) amended section 23 of the Federal Water Power Act to impose a mandatory requirement for declarations of intention prior to construction.[13] As the Commission declared in the declaratory order in this case, "[s]ection 23(b), * * *, was added to the Act in 1935 to give the Commission more effective control of the hydroelectric industry." [14] To attribute to pre-1935 statements controlling effect in determining the scope of that section would undermine this congressional purpose,[15] for developments once exempted by the Commission from its licensing authority could never be subjected to any sort of supervision or regulation, and the goal of "comprehensive development of the water resources of the Nation" would be severely frustrated.[16]

---

13. See note 7, supra.

14. 36 F.P.C. ....., ..... (1966).

15. The Commission's observation, to which Nantahala refers us, that section 23 was intended to "give to power structures in nonnavigable streams a more certain tenure" by restricting the Commission's right to require "removal or alteration" of previously approved facilities in the light of changed conditions, see note 8 supra and accompanying text, is totally inapposite in the context of the present case. The Commission is not claiming the right to require structural changes in the developments, lawful when constructed, but merely the right to subject them in the future to the licensing provisions of the Act.

To the extent that the Commission was of the view that section 23 was meant only to insulate developments from future structural changes, the other pre-1935 statements upon which the Company relies, see pages 6 and 7, supra, provide little, if any, support for the claim Nantahala advances in this case.

16. See Northwest Paper Co. v. F. P. C., 344 F.2d 47 (8th Cir. 1965). There Congress in 1886 passed a Special Act giving permission to the predecessors in interest of Northwest to construct a dam and appurtenant facilities for the generation of water power across the Mississippi River. Congress expressly reserved the power to "alter, amend, or repeal" the Act. In 1950, after passage of the Federal Power Act, Northwest obtained the consent of the Army Corps of Engineers to reconstruct the dam in response to a flood which virtually destroyed the entire facility.

In a declaratory proceeding in 1963, the Commission held that Northwest violated section 23(b) of the Federal Power Act by rebuilding the dam in 1950 without having applied for and obtained a license. Northwest's defense before the Commission was that the 1886 Act brought it within the exemption of section 23(b) for the unlicensed construction and operation of facilities "in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920 * * *," and that it therefore had the indefeasible right in perpetuity, to replace the original project with other facilities, subject only to the limitations contained in the Special Act.

The court quoted with approval the Commission's rejection of this argument on the ground that

" 'It is unreasonable to assume, * * * that Congress was delegating to a specialized expert body the obligation of securing comprehensive development of the nation's power resources, while reserving to itself the responsibility of continued surveillance over all locations where any developments had been constructed under previously granted permits.' "

344 F.2d at 52. See also Minnesota Power & Light Co. v. F. P. C., 344 F.2d 53 (8th Cir. 1965) (companion case).

As in *Northwest Paper*, were we to accept Nantahala's contention that it is entitled to immunity from the licensing provisions of the Act, Congress alone, and not the body of experts to which it has delegated the responsibility of "securing comprehensive development of the nation's power resources," would have the policing obligation.

The abbreviated excerpt from the General Counsel's 1947 remarks, made *after* the Act was amended, concerning the Commission's power to reserve jurisdiction, in no way undermines our position, for the General Counsel went on to say that in his opinion the language of section 23(b), which gives consent

"for the construction of a proposed development upon compliance with State laws [was] unnecessary because if the stream is subject to Federal jurisdiction it is so regardless of what the Federal Power Commission may or may not do. If it is not subject to Federal jurisdiction Congress or the Federal Power Commission or any other Federal agency cannot make it so." [17]

There is no indication that the General Counsel thought that the Commission lacked jurisdiction over developments which, while initially not found subject to federal regulation, subsequently are determined to exert an influence on commerce.

The Commission, itself, has provided the complete answer to the Company's claim that that body has uniformly declined to reserve jurisdiction over developments once found not to affect commerce. In approving unlicensed construction of four of petitioner's seven developments here involved, the Commission said:

"However, it should be plainly stated that further development of the watershed of the Little Tennessee River may so change the material facts upon which we based our findings as to individual projects, that reexamination of the effect upon the navigable capacity of the Little Tennessee River of a series of developments in combination may be required. It is conceivable, therefore, that while there may be no basis at the time a declaration of intention is filed for requiring a license for a single development, such a development in combination with others in the watershed may later be found to affect the interest of interstate commerce and hence Federal licenses might then be required for all the developments in the headwaters." 8 F.P.C. 1117, 1119 (1949). The Commission accordingly qualified its formal finding with the proviso that

"these findings shall not be construed as relating to any effects upon the interests of interstate commerce which might be caused by any other hydroelectric developments, existing or prospective, individually or in combination with the developments involved herein, within the basin of the Little Tennessee River."

The Company argues that the above quoted proviso did not reserve jurisdiction, but merely gave notice that the Commission's findings of no effect on commerce "should not be construed as barring the possibility that licenses might be required for other developments." Plainly, this misconceives the thrust of the proviso. In unequivocal language the Commission was admonishing the applicant that while Nantahala's facilities might not then have the necessary impact on commerce, these facilities plus those that might later be constructed (by Nantahala or by others) could in combination well exert a substantial enough effect. In that event, Nantahala might be required to apply for licenses covering developments already built and in operation.

In concluding this part of our discussion, it is worth recalling that, as heretofore noted on page 8, the Commission's Solicitor, in his testimony before Congress, alluded to "construction work" only as being freed from the licensing provisions of the Act, by a finding of lack of effect on commerce.

■ We turn next to petitioner's asserted reliance upon license-free operation. The ready answer is provided by the Supreme Court, which said in Louis-

17. Hearings on H.R. 2972 and H.R. 2973 before the Subcommittee of the House Commission on Interstate and Foreign Commerce, 80th Cong., 1st Sess., at 443 (1947).

ville Bridge Co. v. United States, 242 U.S. 409, 420, 37 S.Ct. 158, 161 (1917):

"It is true that Congress must have contemplated that a large investment of private capital would be necessary, and that the bridge when once constructed could not be abandoned or materially changed without a total or partial loss of value. This is a very grave consideration, and we have not at all overlooked it; but we cannot deem it controlling of the question presented. It may be assumed that the parties foresaw, what experience since has demonstrated, that it would be many years before changing conditions of navigation would render the bridge out of date, and that the investors were satisfied with the prospect of the profit to be gained from the use of the bridge in the meantime."

There a bridge owner failed in its attack on an order of the Secretary of War requiring it to undertake major structural changes in the bridge, which when built exceeded the minimum clearances mandated by statutes in force at the time of construction. In the present case, the burden imposed on Nantahala is no greater—indeed it would seem less onerous—for it need only conform its future operations to the reasonable regulations promulgated by the Commission and imposed alike upon all owners of developments that affect commerce.

■■■ In view of the national interest in regulating our natural resources of electrical power, we are justified in protecting only those "reliance" interests that are based upon exemptions clearly delineated by Congress. Unless the inference is unambiguous and compelling, a court would not be warranted in upholding a claim that Congress meant to create an indefeasible private right springing from an initial exercise of the Commission's regulatory authority, that would survive and remain immune from future regulation under any circumstances. This thought finds authoritative expression in the following language of the Court in *Louisville Bridge:*

"* * * when private rights of an indefeasible nature are sought to be derived from regulatory provisions established in the exercise of this power [to regulate commerce], the case is peculiarly one for the application of the universal rule that grants of special franchises and privileges are to be strictly construed in favor of the public right, and nothing is to be taken as granted concerning which any reasonable doubt may be raised. As this court, speaking through Mr. Chief Justice Waite, declared in Newport c & C. Bridge Co. v. United States, 105 U.S. 470, 480, [26 L.Ed. 1143, 1147:] 'Congress, which alone exercises the legislative power of the government, is the constitutional protector of foreign and interstate commerce. Its supervision of this subject is continuing in its nature, and all grants of special privileges, affecting so important a branch of governmental power, ought certainly to be strictly construed. Nothing will be presumed to have been surrendered unless it was manifestly so intended. Every doubt should be resolved in favor of the government.'"

242 U.S. at 417–418, 37 S.Ct. at 160.

Nantahala misconstrues the impact of *Louisville Bridge* when it attempts to distinguish that case on the ground that there

"* * * the question was whether Congress could revoke by statute earlier special acts granting permission to construct a bridge across a navigable water of the United States. In the instant case Congress has not taken any action to revoke its permission. It is the Commission, created by the same Act that provides the Congressional permission, that is attempting to revoke such permission without Congressional authorization and in derogation of specific provisions of the statute."

In *Louisville Bridge,* the investor argued that the earlier statute gave him an "irrevocable franchise" to construct and maintain the bridge. Paralleling the Bridge Company's argument, almost in

its very words, the Power Company here contends that section 23(b) affords it "indefeasible permission" to operate its developments without licenses. The task here, as in *Louisville Bridge*, is to ascertain the extent of the immunity conferred by Congress. We reject as irrelevant the issue framed by Nantahala, whether the Commission is empowered unilaterally to retract a congressional grant.

Nantahala suggests that acceptance of the Commission's position carries with it the "anomalous result" that developers whose projects were initially found to affect commerce would be in a more enviable position than those whose projects were initially found not to affect commerce, but found to affect commerce sometime after construction. Only in the former case, Nantahala reasons, would the developer have had the opportunity to weigh all relevant considerations, including licensed rather than unlicensed operation, *before* construction.

The anomaly is more fanciful than real. The greater latitude afforded the developer who enjoys a period of years of license-free operation,[18] may, in terms of financial reward, be more than adequate to offset the uncertainty said to attend the development's future status. However this may be, on the record before us, it cannot be said that the utility is being shortchanged, or stands in danger of being seriously disadvantaged in the future. That investors have not hesitated to construct facilities which from their inception were subject to li-

censing is evidence that the financial yield of regulated developments is sufficiently attractive to overcome any actual, as opposed to theoretical, unfairness to Nantahala.

■ What we have said to this point answers the Company's contention that the Commission may not employ its ancillary administrative powers, conferred in section 4(g) of the Act,[19] or the doctrine that an administrative agency has inherent power to correct mistakes of law,[20] to "extend the scope of Commission jurisdiction under section 23(b)." Since, as shown, Congress never intended that a determination of lack of effect on commerce would forever oust the Commission of jurisdiction, it follows that the Commission had authority to issue the order under review.

■ It is therefore not necessary to rest decision on the ground that section 4(g) affirmatively reflects a strong congressional purpose to vest broad continuing power in the Commission to regulate the use of navigable streams and "to issue such order as it may find appropriate, expedient, and in the public interest * * *." In no event would we be disposed to accept the Company's view that the section is merely procedural. Not only is the section physically separated from the procedural provisions,[21] but it evinces a meticulous design to conserve the national interest. In Union Electric Co. v. F.P.C., 326 F.2d 535 (8th Cir. 1964), reversed on other grounds, 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965), the Eighth Circuit, while deny-

---

18. Nantahala's seven developments have been in operation for periods ranging from 12 to 25 years.

19. Section 4(g), 16 U.S.C. § 797, provides that the Commission is empowered: "Upon its own motion to order an investigation of any occupancy of, or evidenced intention to occupy, for the purpose of developing electric power, public lands, reservations, or streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States by any person, corporation, state or municipality and to issue such order as it may

find appropriate, expedient, and in the public interest to conserve and utilize the navigation and water-power resources of the region."

20. See Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). See also United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 15 L.Ed. 2d 284 (1965) : "An agency, like a court, can undo what is wrongfully done by virtue of its order."

21. Compare the placement of section 309 of the Act, 16 U.S.C. § 825h.

ing Commission jurisdiction on the theory of interstate transmission of electricity, nevertheless stated that:

> "If in the operation of the project it later develops at any time in the future that the *navigability* [the traditional basis of Commission jurisdiction, see note 1, supra, to which the Eighth Circuit erroneously held the Commission was restricted] of the Black River is impaired or threatened to be impaired, the Commission would have authority under § 4(g) of the Act to issue an appropriate order, including an order to prevent further operation of the project without a license." (Emphasis added.)

326 F.2d at 553.

## II

▬ The second line of defense interposed by Nantahala is that to require it to obtain licenses covering the seven developments would amount to an unconstitutional taking of property without just compensation, in violation of the Fifth Amendment.

The argument is rather involved. It is premised upon section 14 of the Act, 16 U.S.C. § 807, which provides that the United States may, at the expiration of the license period, "take over" any development, in return for which it shall pay "the *net investment* of the licensee \* \* \* not to exceed the fair value of the property taken, \* \* \*."[22] (Emphasis added.) The difference between the net investment in the seven developments and their fair value at the time of recapture is the amount by which it is asserted that just compensation might be denied.[23]

The recapture provisions of the Act have survived constitutional attack when applied to developments in navigable waterways, or facilities so situated as to affect them.[24] The rationale of these decisions, according to petitioner, is that with respect to navigable waterways, there exists a dominant federal servitude that gives the federal government the

22. Section 14 of the Act reads in relevant part:

"Upon not less than two years' notice in writing from the commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project or projects as defined in section 3 hereof, and covered in *whole or in part by* the license, or the right to take over upon mutual agreement with the licensee all property owned and held by the licensee then valuable and serviceable in the development, transmission, or distribution of power and which is then dependent for its usefulness upon the continuance of the license, together with any lock or locks or other aids to navigation constructed at the expense of the licensee, upon the condition that before taking possession it shall pay the net investment of the licensee in the *project or projects taken*, not to exceed the fair value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and dependent as above set forth but not taken, as may be caused by the severance therefrom of property taken, and shall assume all contracts entered into by the licensee with the approval of the Commission. \* \* \*

*Provided,* That the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this Act at any time by condemnation proceedings upon payment of just compensation is hereby expressly reserved."

23. For purposes of our decision, we accept without discussion Nantahala's contention that to satisfy the Fifth Amendment, compensation must equal fair value, and that, normally, net investment value, as defined in section 3(13) of the Act, 16 U.S.C. § 796, is less than fair value. Cf. United States v. Appalachian Electric Power Co., 311 U.S. 377, 427, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

Support for this view may be found in the proviso to section 14 of the Act, which preserves the right of the United States to recapture a licensed development "at any time \* \* \* upon payment of just compensation \* \* \*." See note 22, supra.

24. See, e. g., United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S. Ct. 291 (1940) ; Niagara Falls Power Co. v. F. P. C., 137 F.2d 787 (2d Cir.), cert. denied, 320 U.S. 792, 64 S.Ct. 206, 88 L. Ed. 477 (1943).

unfettered right to prohibit all construction.[25] On the theory that the greater right includes the lesser, petitioner acknowledges that the federal government may therefore grant the right to construct on any terms it chooses, including recapture at less than fair value.

With respect to the seven developments involved in this appeal, however, petitioner maintains that the Commission's finding that they exert no influence on down stream navigability negates the existence of a dominant federal servitude. According to petitioner's contention, no property right of the federal government being at stake, the assertion of federal authority is based exclusively upon the government's right to regulate commerce —specifically the interstate transmission of electricity. Where, as here, the activity in commerce has not been found injurious to the public health, the argument runs, Congress may not prohibit it entirely but may subject it to reasonable regulation only, which, it is asserted, does not encompass recapture at less than fair value.

We do not find it necessary to evaluate this labored argument, which is based upon a conceptual distinction bearing no relationship to the realities in the regulation of the national power system, for we think that, on the record before us, decision of the fine-spun Fifth Amendment question would be premature.

On oral argument of this appeal, we were informed that in 1968, upon expiration of the earliest licenses, granted for not exceeding 50 years, the Commission will have its first opportunity to consider license renewals. No indication is available as to what the Commission's policy may then be in this regard. If Nantahala now applies for and obtains licenses, they will not expire for a number of years.[26] There is absolutely no basis for a reasoned prediction that the Commission will attempt to invoke the recapture provisions upon expiration of the licenses to be issued for the seven developments. Neither can one predict with any measure of assurance that if recapture is sought, the fair value at the time of recapture will exceed the net investment. Also, possible future changes in the bed of the Tennessee River, or its tributaries or the use of riparian lands, may create an effect on "downstream navigability," and the developments may thereby become subject to what even Nantahala acknowledges as the government's limited right of recapture at less than fair value. Thus, not only the possibility of recapture, but the possibility of recapture upon terms raising Fifth Amendment questions, is so speculative that the constitutional question is obviously not ripe for decision.

### III

The petitioner's third and final proposition is that it is exempt from licensing by virtue of section 26a of the Tennessee Valley Authority Act, 16 U.S.C. § 831y–1, because of its relationship to the TVA.[27] Petitioner contends that in light of the Fontana Agreement,[28]

---

25. Petitioner points to the discussion contained in United States v. Kansas City Life Ins. Co., 339 U.S. 799, 808, 70 S.Ct. 885, 94 L.Ed. 1277 (1950).

26. See Section IV, infra.

27. Section 26a reads in pertinent part that:
 "The requirements of this section shall not be construed to be a substitute for the requirements of any other law of the United States or of any State, now in effect or hereafter enacted, but shall be in addition thereto, so that any approval, license, permit, or other sanction now or hereafter required by the provisions of any such law for the construction, operation, or maintenance of any struc-

tures whatever, except such as may be *constructed, operated, or maintained* by the Corporation, shall be required, notwithstanding the provisions of this section." (Emphasis supplied).

28. The Agreement became effective on August 14, 1941, and, as amended on December 27, 1962, is currently in force. It was entered into pursuant to section 26a of the Tennessee Valley Authority Act, 16 U.S.C. § 831y–1, which provides that:
 "The unified development and regulation of the Tennessee River system requires that no dam, appurtenant works, or other obstruction, affecting naviga-

which gives the TVA the right to control the impounding and releasing of water at the seven plants, and also makes available to the TVA all energy generated at the plants, the TVA "operates" the developments within the meaning of the exemptive provision of section 26a.

ALCOA unsuccessfully advanced the identical argument to the Commission in 1954, with respect to other facilities owned by it.[29] Nantahala criticizes the earlier decision on the ground that there the Commission unduly restricted the scope of the word "operate" by excluding from its reach all developments except those physically operated by the TVA.

The terms of the agreement disclose no support for the claim to exemption. True, under the agreement petitioner does not retain an unfettered right to generate electricity when, where, and in amounts it chooses, and it is subject to regulations imposed by the TVA in light of that corporation's responsibility to coordinate all power operations within the Tennessee River watershed.

However, were we to infer from these incidents of control, an "operation" of the facilities by the TVA in the broad sense advocated, the result would be startling indeed. It would, in effect, exempt from the Power Act's licensing requirements all developments in the Tennessee River system, for anyone wishing to construct a power facility in the Tennessee River watershed must first obtain approval of the governing Board for a plan of operation that will harmonize the activities of the facility with those of other developments in the Tennessee

River system.[30] All owners would be freed from regulation except to the limited extent outlined in agreements similar to the Fontana Agreement, which is solely concerned with the "coordinated operation of power facilities" in the Tennessee River system.[31] The Commission, whose interests are broader than those of the TVA, and certainly no less important, would be precluded from implementing needed improvements or modifications consistent with the *national* interest.

In addition, under section 20 of the Federal Power Act, licensed utilities are restricted to charging rates "reasonable, nondiscriminatory, and just to the customer * * *."[32] The Commission also retains certain supervisory powers under section 10(d) over the financial operations, accounting practices, and rates of return of licensed utilities.[33] On the other hand, developments "constructed, operated or maintained" by the TVA, because of their character as "government corporations," are not subject to similar restrictions. We are of the view that the more reasonable construction of the section 26a exemption is that made by the Commission in 1954, namely, that only facilities either owned by the TVA, or whose actual day-to-day physical operation is undertaken by the TVA, are exempt from the licensing provision of the Act. There is no justification for converting what was designed as a limited exemption on behalf of a government corporation into a sweeping exclusion that may be availed of by every private power enterprise operating within the Tennessee River watershed.

We do not overlook the petitioner's earnest representation that to bring its

tion, flood control, or public lands or reservations shall be constructed, and thereafter operated or maintained across, along, or in the said river or any of its tributaries until plans for such construction, operation, and maintenance shall have been submitted to and approved by the Board; and the construction, commencement of construction, operation, or maintenance of such structures without such approval is hereby prohibited. When such plans shall have been approved, deviation therefrom either before or after completion of such structures is prohibited unless the modification of such plans has previously been submitted to and approved by the Board."

29. Aluminum Co. of America, 13 F.P.C. 14 (1954).

30. See footnote 28, supra.

31. The quoted language is the title of Article II of the original Fontana Agreement.

32. 16 U.S.C. § 813.

33. 16 U.S.C. § 803(d).

facilities within the Commission's regulatory power would, in light of the control exercised by the TVA under the Fontana Agreement, subject it to two masters, who may not always see eye to eye. We think, however, that the fear is exaggerated. Article VI(1)(a) of the amended agreement, set forth in the margin,[34] provides ample basis for an accommodation among the interested parties, which will obligate Nantahala to obey only one set of consistent directives.

### IV

We hold that the Commission is empowered to require petitioner to apply for and obtain licenses for the seven facilities here at issue. Because this Company has operated the developments over the past 12 to 25 years in good faith reliance upon Commission findings that they do not affect commerce, a question possibly arises whether the Commission is entitled to back-date the licenses, and thereby shorten their maximum 50 year term, to the respective dates of completion of the projects.[35] We refrain from expressing any opinion on this point, or in respect to other adjustments that may appropriately be made in view of the delayed licensing. If, in proceed-

ings following this decision, an issue of this character should be determined adversely to the applicant, it may, of course, seek review.

For the reasons stated, the Commission's order will be enforced.

Enforced.

---

34. "1. *Limitations, Restrictions, and Waivers.*

(a) It is recognized by the parties that Company is or may be subject to laws, orders, restrictions, regulations, decrees, or licenses of the United States of America or its agencies (excluding TVA) or of certain states or their agencies with respect to Company's generating plants and transmission facilities. Company shall keep TVA informed thereof and, upon request by TVA, Company will contest the validity of any such laws, orders, restrictions, regulations, decrees, or licenses which to any extent greater than heretofore established or recognized by Company deprive Company of the ownership, control, or right to operate any of its hydroelectric plants or any of its transmission facilities. In the event and to the extent that, and for so long as, Company is involuntarily deprived of the ownership, control, or right to operate any of such plants or any of its transmission facilities by decree of court or by any laws of

actions of the United States, of any state, or of any of the agencies of either of them, Company's obligations hereunder to that extent shall cease to be binding and an equitable adjustment shall be made in the amount of normal power TVA is obligated to make available to Company pursuant to section 1 of Article IV hereof."

The express recognition in Article VI (1)(a) that Nantahala "is or may be subject to * * * regulations * * * of the United States of America or its agencies (excluding TVA)" cuts against exemption for the developments from Commission licensing. It provides some support for the view that both the Company and the TVA were aware of the real possibility that the facilities were subject to Commission licensing, notwithstanding the incidents of control which the agreement vested in the TVA.

35. Compare Central Maine Power Co. v. F. P. C., 345 F.2d 875 (1st Cir. 1965). See also Rumford Falls Power Co. v. F. P. C., 355 F.2d 683 (1st Cir. 1966).