**FEDERAL ENERGY REGULATORY COMMISSION, Plaintiff,**

v.

**Theodore A. KECK, III, Holly S. Keck, Defendants.**

**Civ. A. No. 1:CV–93–301.**

United States District Court, M.D. Pennsylvania.

· April 16, 1993.

Ellen K. Schall, Steven A. Rothman, Jonathan E. First, F.E.R.C., Office of Enforcement Counsel, Washington, DC, for plaintiff.

## MEMORANDUM

CALDWELL, District Judge.

Pending is Plaintiff's motion for preliminary and permanent injunctive relief. This matter arises under the Federal Power Act, 16 U.S.C. § 791a, *et seq.* ("FPA") and, so, we properly exercise jurisdiction according to 28 U.S.C. § 1331.

## I. *Facts*

Plaintiff is the Federal Energy Regulatory Commission ("the Commission"), a federal agency charged, *inter alia*, with enforcing the FPA. Defendants are the owners of the Blackstone Mill ("Blackstone"), a small hydroelectric generating facility on the Mahantango Creek in Dauphin County, Pennsylvania.[1] Blackstone produces about 200,000 kilowatt-hours of electricity annually. In February, 1983, Defendants contracted with the Pennsylvania Power and Light Company ("PP & L") to sell Blackstone's output to the utility. Plaintiff offers evidence that Defendants were selling electricity to PP & L at least as late as December, 1992.

On November 4, 1986, Defendants Theodore and Holly Keck filed an application for

---

1. The Blackstone Mill essentially includes a powerhouse next to the Mahantango Creek. The creek is diverted for approximately a half mile so

an exemption from federal licensing.[2] The Commission ultimately dismissed that application because it did not include required information. The Kecks appealed the application dismissal, but the appeal was dismissed as untimely. In February, 1989, the Pennsylvania Fish Commission notified the Federal Energy Regulatory Commission that Defendants were continuing to operate Blackstone without a federal license. The Commission investigated and, on March 14, 1989, determined that Blackstone was subject to the licensing provision and was not in compliance. The agency ordered Defendants to submit an application for either a license or an exemption within 12 months. Order Finding Hydroelectric Project Jurisdiction, 46 FERC ¶ 63,425 (1989). Defendants failed to comply and, on October 18, 1990, the Commission issued a compliance order setting specific filing deadlines. Compliance Order, 53 FERC ¶ 62,053 (1990).

Three months later, Defendant Theodore Keck filed copies of letters from state and federal lawmakers with the Commission, apparently believing them to be a sufficient application for a license.

> Since no studies are required, and sence [sic] there are no forms for application for your license, please consider this letter my request for your license. I beleve [sic] you have on file all the information you need for my license.

Letter from Keck to the Commission of January, 1991.[3] A month later, the Commission notified Defendants that the application was deficient and forwarded instructions for making a proper application, including a sample application. Plaintiff indicates that it received no response.

On October 15, 1991, the Commission again informed Defendant Theodore Keck

that his application was inadequate. The Commission's letter specified the deficiencies of Defendant's 1991 submission and provided that:

> [y]our efforts to bring yourself into compliance with the Commission's order in Docket No. UL89–15–004 by filing an *acceptable* license application as soon as possible may be a factor in determining future Commission enforcement action. Within 15 days of the receipt of this letter, you must file a report explaining the reasons why you did not file an acceptable application and what steps you are taking to revise your application and bring yourself into compliance. This letter constitutes notice under Section 31(a) of the Act.

Letter from the Commission to Keck of October 15, 1991 (emphasis added). The letter further informed Defendant that the Commission would seek a meeting with him to more fully explain the process. It concluded by noting that the application would be rejected if the necessary corrections were not made within 90 days. Again, Plaintiff indicates that there was no response from Defendants. Commission personnel met with Mr. Keck on December 4, 1991. During that meeting, Mr. Keck requested that the Commission waive all licensing requirements for Blackstone. The Commission representatives notified him that there is no statutory basis for such a waiver. Subsequently, on January 28, 1992, the Commission rejected Defendant's application. On March 31, 1992, the Commission issued a compliance order to Theodore Keck, requiring him to "immediately cease and desist all project-related operations until he has received a license from the Commission." Compliance Order, 58 FERC ¶ 63,618 (1992). Mr. Keck filed a timely request for a rehearing before the

---

that its water will run through the powerhouse and turn the turbines on two generators.

**2.** The Federal Power Act requires persons operating power houses to seek either a federal license or an exemption. 16 U.S.C. § 817.

**3.** The enclosures included letters from Pennsylvania State Representatives Bruce Smith, Camille George, and Jeffrey Piccola, the late United States Senator John Heinz, and several local officials. The Heinz letter is typical:

> Although I am not in a position to evaluate your application from the standpoints of compliance with federal, state, and local requirements governing, among other things, maintenance of adequate water flows and protection of fish and wildlife, I strongly believe that your type of power-generating operation is one that deserves support.

Letter from Heinz to Keck of Dec. 17, 1990.

Commission, but it was denied on July 23, 1992. *See* Order Denying Rehearing, 60 FERC ¶ 61,226 (1992). The Commission's order again required the Kecks to cease operation of Blackstone until the Commission granted either a license or an exemption. *Id.* Plaintiff's brief does not indicate any further proceedings or communications involving Defendants. The Commission filed the current action on March 2, 1993, and the pending motion on the same date.[4]

II. *Law and Discussion*

A. Commission Jurisdiction

■ As a threshold matter, we must determine if the Commission correctly concluded that Blackstone falls within the federal licensing requirement. We will not dwell on the issue of what deference to afford the agency conclusion, as we agree that it properly exercised its jurisdiction.

The FPA's licensing mandate is found in § 817.

> It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States,. or upon any of the public lands or reservations of the United States (including the Territories) ... except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, *or a license granted pursuant to this chapter.*

16 U.S.C. § 817(1) (emphasis added). Seeking to encourage small hydroelectric projects, Congress provided for exemptions from the licensing requirement in the Public Utility Regulatory Policy Act of 1978, 16 U.S.C. § 2705(d). It provides that the Commission may, in its discretion, grant an exemption to a hydroelectric facility producing 5,000 kilowatts or less. *Id.*

The Commission argues that Blackstone falls within the definition of § 817 and, therefore, must be licensed or exempted. The project is situated on the Mahantango Creek, which is a tributary of the Susquehanna River. While the Mahantango itself is not navigable, the Commission has long regarded indirect tributaries of navigable waters to be included in the mandate of § 817. *See Metropolitan District Commission and Massachusetts Water Resources Authority,* 54 FERC ¶ 61,330 (1991); *see also, Nantahala Power & Light Co. v. Federal Power Commission,* 384 F.2d 200, 202, 214 (4th Cir. 1967). The FPA defines "navigable waters" as

> those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters ... are used or suitable for use for the transportation of persons or property in interstate or foreign commerce ...

16 U.S.C. § 796(8). In the current action, the Commission assumes that the Susquehanna River is navigable and that, therefore, its jurisdiction reaches that river and the Mahantango Creek as an indirect tributary. There is ordinarily a separate analysis to determine if a body of water is navigable. *See City of Centralia v. FERC,* 851 F.2d 278 (9th Cir.1988). Here, however, we believe there is sufficient precedent to readily conclude that the Susquehanna is a navigable river. *See Pennsylvania Water & Power Co. v. Federal Power Commission,* 123 F.2d 155 (D.C.Cir.1941) (determining navigability for purposes of applying the FPA to a hydroelectric project).[5]

---

4. Defendants have failed to file an answer to the complaint or to oppose the current motion. Both are long overdue. *See* Fed.R.Civ.P. 12(a) ("A defendant shall serve an answer within 20 days after the service of the summons and complaint ...") and Local Rule 401.6 ("Any party opposing any motion shall file three (3) copies of a responsive brief ... within fifteen (15) days after service of the movant's brief. Any respondent who fails to comply with this rule shall be deemed not to oppose such motion."). Plaintiff's brief was filed on March 2, 1993.

5. In *Pennsylvania Water,* the D.C. Circuit described the long history of the Susquehanna, beginning with its discovery in 1608 by Captain

## B. Defendants' Noncompliance ~

Assuming the facts as offered by the Commission, Defendants' project is clearly not in compliance. As noted, Blackstone falls within the licensing requirement, yet Defendants have failed to receive either a license or an exemption from the Commission. Defendants have twice submitted deficient applications, and despite repeated communications and explanations from the Commission, Defendants twice failed to complete the application process.

## C. Standard for Injunctive Relief

The Commission now asks that we grant either a preliminary or permanent injunction preventing Defendants from operating Blackstone until they receive either a federal license or an exemption. The request is premised upon 16 U.S.C. § 825m(a).

The Commission admits that "no court has had the opportunity to review this section." Our research likewise demonstrates that this is an issue of first impression.

The enforcement provision of the FPA mandates as follows:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and *upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted* without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in

his discretion, may institute the necessary criminal proceedings under this chapter.

16 U.S.C. § 825m(a) (emphasis added). Neither the statute nor the case law describe what would constitute a "proper showing."

We are not, however, wholly without guidance. There are at least two other federal statutes that include virtually identical language, and for which there is ample judicial interpretation.

The Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq.,* provides that the Securities and Exchange Commission may seek an injunction to forestall violations of the Act. 15 U.S.C. § 77t(b). The language from the Securities Act and the FPA are almost interchangeable.

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States or United States court of any Territory to enjoin such acts or practices and *upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted* without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this subchapter....

15 U.S.C. § 77t(b) (emphasis added). The Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.,* includes a similar enforcement provision.

**(b) Injunction or restraining order**
Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

7 U.S.C. § 13a–1.

█ It is appropriate, when construing statutory language, to give like interpreta-

---

John Smith, of the Jamestown Colony. He wrote "Thirtie leagues Northward [from the Patuxent River] is a river not inhabited, yet navigable; ..." John Smith, *quoted in Pennsylvania Water,* 123 F.2d at 160. The river begins at Lake Otse-

go in central New York and runs 400 miles through New York, Pennsylvania, and Maryland. It empties into the Chesapeake Bay at Havre de Grace. *Id.*

tions to like phrases. *See United States v. Kraase,* 484 F.2d 549, 552 (7th Cir.1973); *Curry v. Block,* 541 F.Supp. 506, 518 (S.D.Ga. 1982); *Gilchrist, et al v. Helena Hot Springs & Smelter R. Co. et al,* 58 F. 708, 716 (D.Mont.1893); *but see, Dailey v. National Hockey League,* 780 F.Supp. 262 (D.N.J. 1991). Here, Congress used the phrase, "upon a proper showing," in all three statutes. In fact, Congress has amended these statutes several times since their enactments. Congress is presumed to act with knowledge of judicial interpretation of previous renditions of legislation. *Norwest Bank Worthington, et al v. Ahlers et ux,* 485 U.S. 197, 210, 108 S.Ct. 963, 971, 99 L.Ed.2d 169 (1988). Therefore, it is logical for us to seek guidance as to what constitutes a "proper showing" in the FPA context by examining cases interpreting that phrase as used in the other two statutes.

■ The clear weight of authority under the Securities Act of 1933 and the Commodity Exchange Act supports the proposition that a "proper showing" is made by demonstrating (1) that a defendant has violated the statute and (2) that there is a likelihood of future violations in the absence of an injunction. *See Commodity Futures Trading Comm'n v. American Bd. of Trade, Inc.,* 803 F.2d 1242 (2d Cir.1986) (construing the Commodity Exchange Act); *Securities and Exchange Commission v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982) (construing the Securities Act of 1933).

We conclude that Congress may be presumed to have known that courts were employing the two-tiered test to discern proper showings for injunctive relief and, so, we may employ that test in the context of the Federal Power Act.

■ In the instant case, the Commission has made a persuasive showing that Blackstone is not in compliance with the FPA. We have determined that the facility falls under the licensing requirement. Given that such licenses are furnished by the Plaintiff in this case, it is indisputable that no license or

exemption has been granted. Therefore, we find that Defendants are in violation of the FPA.

The second prong of the statutory injunction test requires that we examine the likelihood of future violations. A district court may infer a likelihood of future violations by referring to past violations. *American Board of Trade, supra,* at 1251. Here, the factual record strongly suggests that Defendants intend to operate their hydroelectric facility regardless of Commission directives. They have ignored repeated compliance orders and are, in fact, continuing to operate Blackstone. Given this background, we believe it probable that future violations will occur in the absence of judicial intervention.

## D. Defendants' Failure to Answer

This case is complicated somewhat by Defendants' failure to respond to the complaint. Ordinarily, equitable relief is not granted based upon the arguments of one litigant, but we conclude that service of the complaint and the motion for injunctive relief gave Defendants more than adequate notice and opportunity to be heard on this issue.[6] We conclude that scheduling a hearing on this matter would be pointless in these circumstances, in that Plaintiff is clearly entitled to the relief it seeks.

## III. *Conclusion*

The Commission has demonstrated that Blackstone is subject to the licensure provision of the FPA, that it is not in compliance, and that future violations are probable. We will, therefore, grant an injunction barring Defendants from further operating Blackstone until they are granted either a federal license from the Commission or an exemption.

---

6. We note that Holly Keck signed two certified mail receipts and both Defendants signed Notice and Acknowledgement of Receipt of Summons and Complaint by Mail forms. Additionally, the

Commission has pursued enforcement actions against Defendants for more than eight years. They can not be heard to complain that they were not afforded notice of the current action.